[Crim. No. 3457. In Bank.—June 30, 1932.]

THE PEOPLE, Respondent, v. GEORGE SMITH et al., Appellants.

Ernest Spagnoli, Charles J. Janigian and Vincent Surr for Appellants.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

SEAWELL, J.—The defendant, George Smith and John Kazarin, were jointly accused by the grand jury of the county of Alameda of having murdered Reinhold A. Frey on or about December 20, 1930, in said county. They were tried together and convicted of murder of the first degree without a recommendation by the jury that a lesser punishment than the extreme penalty, which is death, be imposed. Judgments imposing the death penalty upon each were accordingly pronounced by the court. Separate appeals were taken from the judgments of conviction and from the orders denying motions for new trials. ■ Objection is made to the sufficiency of the indictment because of the failure to allege that the crime was committed with malice aforethought or that Reinhold A. Frey was a human being. It does not describe the crime as a felony. The crime is pleaded in the form and language of the statute and therefore is sufficient. (Pen. Code, sec. 951.) That the deceased was a human being was amply shown by the evidence. So also was the homicide shown to have been committed wickedly and with malice aforethought. The use of the word "murdered", which appears in the indictment, is an additional answer to both objections.

Defendant Kazarin, after conviction and while confined in the state prison at San Quentin, pending his appeal, took his own life. The appeal as to him has been dismissed.

The defendants were both residents of the city and county of San Francisco. The deceased was a man of small stature, being five feet and four or five inches in height, and weighed 140 or 145 pounds, and he was past fifty years of age.

He was a member of the copartnership of Dempsey & Frey, engaged in conducting a cigar and soft-drink business on the north side of 12th Street, between Franklin and Webster Street, several doors east of the St. Marks Hotel in the city of Oakland. Dempsey & Frey were also engaged in cashing pay checks for the employees of several factories and plants in said city of Oakland. It was the custom of the deceased to go to the Bank of America, situate at the northeast corner of 12th and Broadway Streets, at about the hour of 9 o'clock A. M. on certain days and draw from said bank several thousand dollars, using a small satchel or bag in which he carried the silver coins from the bank to his place of business. On the morning of December 20, 1930, he went to said bank, as was his custom, and drew $2,500, $500 of which was in silver and $2,000 in currency. He placed the silver in the small satchel and put the currency in his pocket. The traffic at this hour was beginning to assume the normal proportions for the day. The Oakland Rubber Company, of which Francis W. Harley is an employee, is located on the north side of 12th Street adjacent easterly to the St. Mark's Hotel, and two or three doors westward of Dempsey & Frey's place of business. Automobiles were parked singly the full length of the curb line. While standing in front of the place where he was employed, from approximately 9 to 9:15 A. M., he had noticed a maroon-colored Chevrolet coupe in the double parking lane opposite to where he stood, moving backwards and forwards in such a manner as to prevent other machines from obstructing its clear exit. At this time the driver's person was not visible to Mr. Harley. He had also noticed for some fifteen or twenty minutes a man wearing a gray cap, gray overcoat buttoned, and amber glasses and smoking a cigar, walk several times up 12th Street from the direction of the Bank of America, which was westerly, as far as the window of the store in which he was employed. His conduct was that of a person watchful of pedestrians and was such as to arouse Harley's suspicions. He also saw the man whom he afterward identified as defendant Smith finally walk over to the maroon-colored Chevrolet, which was then double parked and which had been maneuvered·by the driver in such fashion as to keep its way open for an unobstructed exit, and hold a conversation with its driver,

a very dark-skinned and black-haired man, whose hair, somewhat disordered, stood up rather straight. He also noticed a large and distinct wound or scar on his forehead over his left eye. He identified this man as defendant Kazarin. The description which he gave in considerable detail fitted Kazarin. Defendant Kazarin admitted from the witness-stand that he had received a wide cut upon the forehead a few days before December 20th from broken glass and the scar was still visible at the time of trial. Shortly after Harley went inside the store to wait upon Broadus, the driver of a Shell Oil Company truck which had double parked immediately behind the maroon Chevrolet coupe, and about two minutes after Smith had talked with the man in the coupe, identified as Kazarin, he heard Frey, who had come from the bank, make an outcry. The witness next saw Smith, who was facing the witness, pull from his pocket upon a second attempt, a dark-colored revolver, shoot and then run to the maroon-colored Chevrolet car, transferring the revolver to his other hand, enter the car and close the door after him. The other man, who was at the wheel, drove westerly toward Franklin, a cross street, which was approximately 125 feet distant from the place where Smith entered the car. It then turned south down Franklin to 11th Street and was lost to view. The witness went out and found Frey lying close to the building line. He was holding the satchel or grip and he said, "Take the grip; don't let them get the grip." The police found in Kazarin's possession when he was arrested in Los Angeles, approximately seven weeks after the commission of the crime, a revolver generally resembling the one the witness saw in the hands of Smith. Defendant Smith was arrested in San Francisco on December 22d, two days after the crime was committed.

Wilfred Broadus, employed as a truck driver by the Shell Oil Company, to whom reference was above made, was another eye-witness to the shooting. He arrived at the scene of the shooting at approximately 9 o'clock A. M. and double parked behind a maroon-colored Chevrolet coupe, 1930, with wire wheels. The car was somewhat dirty and had some mud spots upon it. It carried no spare wheel or tire. As he left his truck to enter the store in which Harley was employed the man whom he identified as defendant Smith

and who had been standing at the door of the Chevrolet car as above described, walked in front of him to the sidewalk and thence to the window of said Oakland Rubber Company and pulled his cap down close to his eyes and straightened his overcoat collar. Broadus walked into the office of the Oakland Rubber Company and stood at a counter which was placed in such manner as to permit one standing at the counter to see through the window. He engaged in conversation with Harley. As he looked through the window he saw defendant Smith back toward the curb, pull a revolver from his pocket, shoot and immediately run to said waiting Chevrolet coupe and enter it. The coupe was driven hurriedly to Franklin Street where it turned southerly out of the witness' view. He hurried to the sidewalk and saw Mr. Frey, apparently wounded, lying near the wall of a building. Neither Harley nor Broadus from their position was able to see Frey. Broadus identified a Chevrolet coupe found two days after the shooting at the rear of and near the premises of Smith's grandfather as corresponding exactly in all respects with the coupe which he saw defendant enter as it was driven from the scene of the shooting. A few days afterward the witness was taken to the city prison for the purpose of testing his ability to identify the defendant Smith who was in a line with several other persons. Smith addressed this remark to him: ''There is no use in looking any further; I am the fellow they are trying to hang it on.''

Leslie Todd, a machinist by trade, but who had for some time past made the cigar-store on the southwesterly corner of 12th and Franklin Streets his headquarters, and in which he occasionally worked, testified that he recognized Smith as a person he had occasionally seen in the locality of the cigar-store for approximately a year. He was not so certain as to Kazarin but he believed that he had also seen him in the locality within a month prior to the day of the shooting. He recalled seeing Smith in the locality within a week prior to the day on which the crime was committed. Smith in his testimony first denied that he had been in the vicinity, but afterward admitted that he had occasionally visited said locality. Witness Todd was attracted to the defendants at some time between 9 and 9:20 o'clock on the morning of December 20, 1930, by an outcry or scream

immediately followed by a shot. He saw Smith get into the maroon-colored Chevrolet coupe which was double parked, and Kazarin, who was at the wheel, started west on 12th Street. In turning into Franklin Street Smith took hold of the wheel as Kazarin apparently was having trouble in making the turn. They barely missed hitting another car as they made the turn. In so doing, it brought the coupe within eight or ten feet of the witness. He recognized the defendants as the persons whom he saw fleeing in the coupe and whom he had formerly seen in the vicinity of 12th and Franklin Streets.

Minot Williams, an ironmoulder by trade, while standing on the curb at the southwest corner of 12th and Franklin Streets at about 9 o'clock in the morning of December 20, 1930, heard a man, who stood with his back to the wall, hollering. It appeared to him that he was fighting off two men. He had a bag which he was swinging in front to protect himself from the attacking men. One of said men was tall and the other shorter. (Smith is a rather tall, spare man, while Kazarin is much shorter.) It appeared to the witness that the shorter man "slugged" the man with the bag and as he buckled up the taller man stepped back and shot him. As the taller man shot, the shorter man ran and entered the coupe, which was double parked, and the taller man followed him. They fled in the car down 12th Street to Franklin, barely missing a collision with another car in their effort to make the Franklin Street turn. The coupe passed very close to the witness, who stood on the street corner, and he was positive as to his identification of the occupants of said coupe, whom he pronounced to be Smith and Kazarin. He took the rear license number of the coupe, which was 7H 44-09. When he went to the city prison for purposes of identification Smith covered his face with a handkerchief. After the witness succeeded in seeing him and identified him with the crime, he said, "God damn it."

Rudy Hilgedick, a salesman for an electrical supply house, upon leaving the lobby of the St. Mark's Hotel heard, as he stepped upon the sidewalk, a man scream and saw Smith standing not more than fifty feet from him with a pistol in his hand. Frey was not more than thirty feet from the witness. The witness stepped back into the doorway and

heard a shot ring out. He then stepped out on the sidewalk and saw Smith leave the sidewalk between two parked cars. The maroon-colored Chevrolet coupe then came past the witness and turned southerly on Franklin Street. Kazarin was leaning over the wheel and he noticed the scar on his forehead. The wheels were painted black and the coupe carried no spare or rack to support one. He made a note of the rear license number which was 7H 44–09. Four days thereafter he saw the coupe, which had been recovered in San Francisco. There is absolutely no doubt but that the coupe first came into the possession of Kazarin on a sales contract dated August 27, 1930, and subsequently into the possession of Smith on a transfer by Kazarin of his equity to Smith by a contract dated October 28, 1930. Both Smith and Kazarin denied their signatures which appeared several times on the conditional sales contract and also on the transfer of equity, but the proof is conclusive against their denials. The witness said the coupe in which he saw defendants on December 20th corresponded in every way with the car which was exhibited to him in Oakland on December 24th, with the exception that the license numbers did not agree. The coupe, which had been recovered in San Francisco on December 24th and which was undoubtedly the coupe which had been in the joint possession of Smith and Kazarin under their contracts, bore a different rear license number than it bore on December 20, 1930. Several persons took the rear license number on December 20th and all tallied as to 7H 44–09. No one attempted to take the forward license number. The license numbers on the coupe shortly after the assault of December 20th were 7K 45–64. This was the legal number. This attempt to confuse identification will presently appear. The witness stated that the license plate holder bore fresh marks and other evidence which indicated that it had recently been tampered with. William McMahon, police inspector in the San Francisco department, was assigned to the duty of locating the missing coupe and did so on December 22d at the rear of the home of Smith's grandfather. He also testified to fresh marks upon the rear metal license plate holder which were probably made by the slipping of a screw-driver in removing the license number plate. The threads of screws which held it in place showed bright and

were rust free. A few screws were missing. Herman Steiger, a switchboard installer of the Western Electric Company, was the owner of a Pontiac car which he kept at the garage of the Olympic Hotel located at the corner of East 12th Street and Second Avenue in Oakland. One of the police inspectors investigating the case called upon him, inasmuch as the license number issued by the state to him was the same number as the license number which the defendants' coupe bore at the time of the shooting and attempted robbery. He had not used his car for two days before December 20th and upon inspecting his car found that the rear license number plate was missing.

Mr. Hilgedick said he was about thirty feet from Smith as he fired at Mr. Frey. The coupe, which was about 125 feet from the Franklin intersection, was started slowly and rapidly picked up speed until it reached the corner. At one time the coupe was headed directly at him. Smith wore eyeglasses when on the sidewalk and had none on after he entered the coupe.

Walter Miller, employed by the Industrial Steel Company, was standing on the south side of 12th Street opposite the scene of the shooting. He heard Mr. Frey scream and ran across the street and saw Smith shoot Frey and jump into the coupe. Miller was about eight feet from Smith as he shot. Kazarin was driving the coupe and looked back a number of times. He had on tortoise-rimmed glasses. Smith had no eyeglasses on after he entered the coupe. Miller followed the maroon Chevrolet from 12th to 11th Street and took the rear license plate number which was 7H 44–09. He identified both defendants as the men who committed the crime charged against them.

John W. Dalley, a construction worker, was standing across the street from where the shooting occurred talking to Ralph Young. The first thing that drew his attention was a man striking another over the head with what appeared to him to be a blackjack or piece of pipe. Frey was attempting to ward off the attack. The motions were fast and he could not distinguish the instrument being used. Frey and the two other men were struggling together. Frey hollered for help and as he did so Kazarin ran to the coupe and the taller man, Smith, stepped back and shot Frey, who fell to the sidewalk. Smith then joined the other man in the

coupe. The witness ran to the scene and was near the coupe as it started. He followed it to the street corner. His description of the coupe agreed in all particulars, even to· the missing spare tire, with the car used by the defendants. He also took the license number. He identified both defendants as the men who took part in the crime.

Ralph Young, a show card printer, who stood on 12th Street opposite to the assault, heard Frey cry out for help and ran across the· street. Frey had his back to the wall and Smith was striking him upon the head. Frey was trying to ward' off the blows. As Frey cried out Smith stepped back two or three steps and shot him. Kazarin ran to the coupe and ·Smith followed him. Smith wore a cap. He described the coupe, not omitting the radiator cap.

The crime was committed not later than 9:15 o'clock on the forenoon of December 20, 1930, and at approximately 11:30 A. M. of that day police officer P. H. Kemeany of the San Francisco police department, who was driving east on Folsom Street near Third Street, in the city of San Francisco, passed Smith and Kazarin driving westerly from the direction of the Ferry landing. He had no knowledge at that hour of the commission of the crime but he, nevertheless, made a note of the license number of the defendants' coupe at the time, which was its proper number, 7K 45–64. The coupe was the same coupe heretofore described. Both Smith and Kazarin had police court records and each had been suspected of the commission of other crimes. The police were in the habit of checking any car they saw them using. Kazarin had served a term in the Preston School of Industry and had been released from the county jail but a short time before he committed the crime of which the defendants stand convicted. This testimony was brought out by the examination conducted by the defense. Both defendants took the witness-stand in their own behalf, but neither of them· nor any witness produced in their behalf gave any testimony or produced any evidence which tended in any substantial manner to disprove or refute the identification of the defendants with the commission of the crime charged against them, or which tended to seriously impeach or shake the evidence as detailed by the eight eye-witnesses as to the participation of the defendants in the commission of said crime. In addition to the testimony of

said witnesses there are a number of incriminatory circumstances which we will not point out, but which may be said to be cumulative in the conclusiveness of the defendants' guilt. The model, body, color of wheels, color of body and top of said car, as well as its condition and equipage, were absolutely described by one or more eye-witnesses, who had ample opportunity to observe the car as well as its occupants.

Neither of the defendants made a serious effort to account for their presence on the forenoon of December 20, 1930. Smith, when arrested on December 22d, said that he was in bed at 416 Bryant Street until 9:30 o'clock A. M. of that day, but further than this isolated statement he produced no witness or evidence as to where he was on that day. The arresting officer was unable to get any information from him as to where the maroon Chevrolet coupe was garaged or parked. He vaguely intimated that it would be produced in due time, and refused to discuss the matter of the assault upon Frey and said that his "mouth piece" would do the talking. What he said to the arresting officer and upon the stand was of no assistance in accounting for his presence at the scene of the murderous assault, where he was placed by at least eight eye-witnesses. Kazarin, his companion for a number of years, also made a weak attempt to establish an alibi. One of the circumstances relied upon by each of the defendants to show the improbability of their fraternizing together on December 20th, was that on or about December 15th they engaged in a fist fight back of Smith's grandfather's residence, 416 Bryant Street, upon the conclusion of which the victor was to be declared the owner of the car. Smith, according to the testimony of the defendants, opened up afresh, with a heavy blow, the wound made upon Kazarin's forehead a few days prior thereto by his contact with glass, and he therefore withdrew his claim of ownership in the car and retired from the premises and he was never thereafter friendly with Smith. This evidence was badly shaken by the further examination of the defendants given later in the trial, and, besides, it is highly improbable. Kazarin claims that he left for Los Angeles immediately after the fight with Smith. He offered nothing but his own uncorroborated statement that he left San Francisco prior to the shooting of Frey and, aside from the testimony of the

identifying witnesses, his claim, in the face of convincing circumstances, is not at all impressive.

██ There is no room for the existence of a reasonable doubt in the case as to the guilt of the defendants of the crime.

Both defendants were represented in the trial court by the same attorney. Upon the appeal they severed. Smith continued with the attorney who defended both defendants in the trial court, and Kazarin engaged the attorney who represented him upon appeal to the day of Kazarin's suicide, as above related. After his death and the dismissal of his appeal, the attorney for Smith obtained leave of this court to incorporate by way of reference certain portions of the brief filed in behalf of Kazarin, to wit: Alleged errors in the court's instructions; the discussion that the doctrine of ''imputed further intent'' no longer obtains in California, and alleged misconduct of the district attorney. ██ The dismissal of Kazarin's appeal, which was largely given to a discussion of the doctrine of ''imputed further intent'', which doctrine it is claimed (against the consistent holding of this court by a long line of decisions since its organization) was abrogated by the legislature of 1856 when it struck from the laws of this state the word *killing* and inserted in its stead the word *murder*, renders it unnecessary to discuss said doctrine, inasmuch as it can have no applicability to Smith. The discussion is founded solely upon the fact that Kazarin did not actually fire the shot that killed the deceased, and, by his construction of section 189 of the Penal Code, Kazarin's attorney reasons that Kazarin was not guilty of murder by reason of his participation in the crime to commit robbery, and, therefore, the first degree murder penalty should not be imposed upon him. This is not an open question in this state. The authorities holding to the contrary are so familiar to the profession that it would be an unnecessary irksome task to again cite them.

But as to Smith, there is no doubt that he is responsible for the death of a human being in an attempt to commit robbery as provided by section 189 of the Penal Code, but independent of said section, he is guilty of deliberately and wickedly killing a human being in a manner which showed him to have been acting under the impulse of an

abandoned and malignant heart. The brief of the attorney for Kazarin in his attempt to save him from his share of responsibility in the killing correctly states the law as applicable to Smith and condemns him as guilty of deliberate murder independent of the purpose to commit robbery. Every instruction defining deliberate, premeditated and wilful murder would have appropriate bearing upon Smith, as appropriate as does section 189 of the Penal Code.

We will now turn briefly to alleged errors of law occurring prior to and at the time of trial. We have not been cited to any authority which holds that a grand jury is an illegal body in case only twenty-eight veniremen were served out of a designated number consisting of thirty. We are not informed as to whether the two whose names were drawn but who were not served, were dead or had left the county. The motion to set aside the indictment on such a ground was properly denied. There is no merit in the claim that the person murdered was not proved to be Reinhold A. Frey, the person named in the indictment. Nor is there any question as to the direct cause of his death. Three physicians attended the autopsy and described the course that the bullet took upon entering the shoulder, passing through one lung and finally cutting the spinal cord. They testified that said bullet wound was the direct cause of death. Several photographs were shown witnesses, from which they made certain identifications of persons. The photographs resembled the persons whom they purported to represent. This was but another way of describing the persons whose appearances were sought to be established. It did not constitute error. One or two other assignments are made but they are too trifling and infinitesimal in substance to merit repetition.

Upon full deliberation we feel that we cannot pass by without rebuke the unwarranted accusations of unfairness made by Kazarin's attorney on appeal against the trial judge. We have read the entire record of the evidence consisting of 647 typewritten pages and can find not the slightest justification for the serious charges made by a counsel who was not present and did not participate at the trial. The attorney who actually participated in the trial does not join in the charges written into Kazarin's brief. The trial court was exceptionally lenient. There seemed to be scarcely

any limit to the bounds which the attorney for defendants was permitted to go. Three days were given to impaneling the jury; six days were given to the taking of testimony in a matter relating to identification. The cross-examinations of witnesses were unnecessarily protracted through hundreds of pages; no objections to questions of doubtful relevancy were sustained against the defense. Objections made by the prosecution and which should have been sustained were frequently overruled by the trial court out of an abundance of caution. The trial judge is severely criticised, in fact, his motives are challenged, because he placed the jury in the hands of the sheriff during the trial of the case. In the light of the experiences of some of the witnesses which developed during the trial it was a wise foresight on the court's part to have relieved the members of the jury from the annoyances to which certain witnesses were subjected.

We find no merit in the charge that the district attorney was guilty of misconduct in opposing the submission of a special form of verdict to the jury on the theory that it would simply confuse it and probably result in a mistrial. The right to return a special verdict was in the power of the jury and the court so informed the jury in its instructions.

The instructions were full, fair and complete. No other point requires discussion.

The judgment and orders appealed from are affirmed.

Curtis, J., Tyler, J., *pro tem.*, Preston, J., Langdon, J., and Waste, C. J., concurred.