[Crim. No. 5698.   In Bank.   Dec. 2, 1955.]

THE PEOPLE, Respondent, v. SMITH EDWARD JORDAN et al., Appellants.

Vince Monroe Townsend, Jr., and Enrico Dell'Osso for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, J. Frank Coakley, District Attorney (Alameda), Robert S. Anderson and Richard C. Lynch, Deputy District Attorneys, for Respondent.

SHENK, J.—The defendants were convicted of first degree murder and sentenced to suffer the penalty of death. Their motions for a new trial were denied. They appeal from the judgments and from the orders denying their motions for a new trial.

On Saturday evening, March 28, 1953, Charles Rose, a driver for the Yellow Cab Company, was found slumped in a semiconscious condition behind the wheel of his cab in front of a house located at 3428 Haven Street, Oakland. The left rear door window was broken. There was blood on the front seat. The radio microphone was off its bracket on the dashboard. The ignition and lights were on, the brake was off, the gear was in high, and the meter flag was still in the "running" position. The driver was bleeding from four wounds on the back of his head, one of which proved to be fatal, and there were abrasions and a laceration on his right hand. He died several hours later.

The cause of death was found to be maceration of the brain and hemorrhage caused by depressed skull fracture. The autopsy surgeon testified that the head wounds were caused by a blunt instrument; that, considering the nature, size and shape of these wounds, he believed that they could have been

inflicted by the butt end of a gun similar to a .45 caliber Colt revolver found in the possession of the defendants the following day.

There was evidence that the killing took place during the course of a robbery. The deceased had left home that Saturday night wearing a wrist watch and carrying a wallet with a $5.00 bill in it. He had some two dollars in change in his coat pocket. He checked in at the Yellow Cab garage at 10:51 p. m. He was next seen at the Greyhound bus depot a short distance away at 11 p. m. under circumstances which indicated he had just taken on some passengers. At 11:12 p. m. the police department received a call from Mrs. Julia Greenup of 3417 Haven Street which led officers to the scene of the crime. There was evidence that only one trip had been made that night by the deceased, and that was the trip from the bus station to the Haven Street address. His wallet and wrist watch and the $5.00 bill were missing when he was found. Just before he died he regained consciousness and asked for his watch and wallet. The inferences from the evidence support the conclusion that the passengers on that trip robbed and killed the cab driver. The identity of the defendants as those passengers and their claimed alibi will next be considered.

On the evening of March 28, 1953, Mrs. Greenup had been sitting by the window of her living room watching television when her attention was attracted by a noise in the street. Looking out she saw a Yellow Cab zigzag slowly down the street "like someone had lost control of it," watched it angle into the curb opposite her house, bounce back and stop. She reached for the telephone to call the police but was unable to complete her call. She continued to watch the cab; saw two men get out; noted that they were dark-skinned; that one was taller and more slender than the other; that one wore a sport coat and the other a light overcoat; that one carried a suitcase; that after leaving the cab they ran back towards 34th Street and as they ran she heard one of them say "Hit it," meaning run. She was unable to positively identify either defendant at the trial.

At 11:16 p. m. that night two men answering the same general description of the defendants boarded a number 72 Key System bus at 34th and San Pablo Avenue, some four blocks away. The driver, Billy Ray Hall, could not identify Pierce but he positively identified Jordan as being the taller of the two men who boarded his bus that night at that loca-

tion. He remembered Jordan because in boarding the bus the latter had bumped a lady passenger with the suitcase he was carrying, and under the company rules the driver was required to report this as an "incident" if the passenger made any complaint. He testified that both men were Negroes; that Jordan's companion carried a light colored topcoat, and that both men got off at 13th and Washington Streets.

At the trial the defendants admitted that they were in Oakland the night of March 28, 1953, but denied that they committed the killing, that they were at the Oakland Greyhound bus depot or in a Yellow Cab at any time during their stay in Oakland, or that they had carried their suitcase with them earlier than midnight that evening. They relied upon their own alibi evidence, namely that they had been at Walker's Tavern, a bar and restaurant located about a block from their hotel at 7th and Union Streets, from 9:30 p. m. until 1:30 or 2 a. m. the following morning; that they had thereafter returned to their hotel, gotten the suitcase, and checked out. They admitted having carried a loaded Colt .45 caliber revolver with them that evening for the purpose of obtaining money with it; and that while they were at Walker's Tavern they had planned to steal a car and use the gun to hold up a liquor store later that night. About 1:30 a. m. they stole a 1950 Ford automobile, committed an armed robbery at a liquor store, and fled the city in the stolen car. They took Highway Number 99, intending to return to Los Angeles.

The jury was justified in disbelieving defendants' alibi evidence. The supporting testimony of Eddie May Hardwell, cocktail waitress at Walker's Tavern, was impeached by prior contradictory statements. From all of the evidence the jury could properly conclude that the defendants had left Walker's about 9:30 or 10 p. m. with the suitcase, made their way to the Greyhound bus station and arrived there by 11 p. m., entered decedent's cab and directed him to the general neighborhood where the cab was found; that they viciously assaulted and robbed the driver; that they ran from the cab and boarded a Number 72 bus a few blocks away; and that thereafter they returned either to Walker's or to the hotel. The proprietor of the hotel where they were registered testified that they had checked in on Friday night for one night only; that she ordinarily did not know when guests checked out, "you just find the door open and they are gone"; that Pierce rang the desk bell a little after midnight on Saturday and said he was leaving; that he was then carrying the

suitcase; and that she had not seen him come in. The owner of the stolen Ford testified that he had left it unattended with the motor running for a few minutes about 1:30 a. m. about a block from Walker's Tavern, and that when he came back it was gone. Defendants testified that it was after they stole the car that they checked out at the hotel.

Defendants drove as far as the city of Bakersfield where they were stopped the next day by police officers for investigation of a minor traffic incident. Pierce was driving and Jordan was sitting next to him. In the back of the car were a light colored overcoat, a sport coat, a suitcase, and other articles of clothing belonging to the defendants. A loaded Colt .45 caliber revolver was in the glove compartment. Because of the inability of Pierce to answer routine questions as to the ownership of the car, the defendants were taken to the police department for questioning and were subsequently booked for possible car theft and for carrying a concealed weapon. Both men denied ownership of the gun, or knowledge that it was in the car. At the trial they admitted that it was their gun.

Jordan first told the police that he was a hitchhiker and had been picked up by Pierce. Later he stated that Pierce had picked him up the night before at the Greyhound bus station in Oakland, and that Pierce at that time had the 1950 Ford. He also said that he met Pierce at Walker's bar on 7th Street in Oakland, and that they had been teamed up for about a month. These statements were made by Jordan out of the presence of Pierce. The next day Pierce admitted, out of the hearing of Jordan, that he had stolen the 1950 Ford and stated that whatever he did "Jordan was with me." At the trial they admitted having come to Oakland together from Los Angeles via San Francisco, and that they had constantly carried the loaded gun with them for purposes of robbery.

While the defendants were in the Bakersfield jail, hold orders were placed against them by various cities on robbery charges. They were interviewed also by Oakland police officers and by representatives of the district attorney's office of Alameda County as to the car theft, the armed robbery, and the cab murder but no charges were placed against them at that time for these crimes. On April 18, 1953, after the defendants had been removed to the Fresno County jail for trial on other charges, they were present at a line-up. The only outside person present was a plain-clothes inspector from

Oakland, Inspector Fake. Pierce voluntarily spoke to Fake at the close of the line-up, asked him if he was an Oakland police officer, and Fake answered that he was. Pierce then stated: "Let's lay off all of this crap and go back to Oakland and cop to the murder." There was evidence that "cop" in the vernacular means to plead guilty. Fake then turned to Jordan and asked him what he wanted to say about it. Jordan replied that he had already told his story but admitted that he was "a liar."

A further conversation took place between Fake and Pierce and was admitted solely against Pierce. It occurred about 20 minutes after the conversation above related between Pierce and Fake. Pierce told Fake that he would go back to Oakland and go to court on the murder charge if all of the robberies would be dropped. Fake replied that he didn't have the authority to agree to this but that he would inform his superiors. At the trial Pierce admitted making these statements but attempted to explain them by saying that he thought he could thereby get the robbery charges dropped, and that he always intended to plead "not guilty" if charged with the cab murder. In answer to questions put to him by Fake at the jail on April 18th, Pierce stated that the cab driver was between 40 and 45 years old (actually he was 48); that the driver had tried "to grab the goddam radio for help"; that Pierce then hit him with the butt of his gun two, three or four times; that he had taken from the driver seven dollars,— some dollar bills and change, also a wrist watch; that they threw the watch away because "it was hot." He also stated that Jordan had gotten out of the cab first; that he, Pierce, got out last because he was carrying the suitcase; that they were going to Los Angeles by Greyhound bus; that after the car robbery they went back to the hotel; and that later that evening they had stolen a car, had done a "stick-up," and had left town.

On April 20, 1953, Lieutenant Hubert Murray of the Oakland Police Department talked with Pierce at Fresno outside of the presence of Jordan. Pierce asked him about the possibility of dropping the other charges against him if he thing over with, but would not do so until Jordan was satisfied, "went for" the cab job. He said that he wanted to get the as he would not "rat" on him. Pierce then admitted that he did the cab job and that he would tell Murray things "you don't even know about it." Murray then talked to Jordan outside of the presence of Pierce, and told him that Pierce

was ready to talk. Jordan asked, "What did he say, did he say I slugged the guy?" When Murray replied "No," Jordan said, "Okay if he wants to go for the slugging, I'll buy that."

An extensive *voir dire* was conducted to determine whether these statements had been made because of inducements held out to Pierce by public officials that the robbery charges would be dropped, whether any promises or rewards had been offered him, and also as to whether his statements had been induced by force or fear. The court properly left it to the jury to determine any conflict in the evidence in this regard. The record supports the implied finding of the jury that the statements were freely and voluntarily made.

The jury was justified in disbelieving Pierce's testimony as to an alleged incident at the Bakersfield police station on March 29, 1953, when, he claimed, he was severely beaten by uniformed officers. The defendants were at that time being separately interviewed in a public part of the temporary police headquarters when Pierce suddenly threw back his coat and cried, "Shoot me, shoot me, shoot me," and began cursing and sobbing. The desk sergeant suggested that the officers take Pierce into a semi-enclosed section so that he would be out of the public view. Pierce testified that while he was inside this room he was severely beaten. He showed to the jury a scar on his left shin which he claimed was caused by one of the officers kicking him. Jordan stated that he heard Pierce call out, and that when the latter came out of the interview room he showed to Jordan a bleeding gash on his shin. The officers denied that any brutality or beating took place. The jailer who took the clothes of defendants when they undressed at the county jail shortly thereafter, testified that he saw no blood or bruises upon Pierce. This was the only evidence of alleged brutality, and the jury was justified in disbelieving it.

Pierce did not request any instructions. Jordan did not request any on confessions and admissions. The court of its own motion instructed the jury on this subject. On appeal Pierce contends that such instructions were "too general," but he does not indicate what instructions he claims were erroneous nor does he specify what instructions he contends should have been given. The record shows that the jury was adequately instructed on this subject; also, that the jury was admonished that the statements of each defendant

were admissible only as against the one making them. ■ There is no merit in Jordan's contention that the admission in evidence of these statements substantially prejudiced his defense. There was sufficient substantial evidence to otherwise sustain the verdict against him.

. ■ It is contended that an instruction on flight was unsupported by the evidence and was prejudicial. The evidence showing flight from the scene of the crime and from the city was abundant. The court properly instructed the jury on the subject in accordance with section 1127c of the Penal Code. (Cal.Jury Instr.Crim. #36.)

. ■ It is argued that the court erred in giving the following instruction: ''The defendants in this case have introduced evidence tending to prove that they were not present at the time and place of the commission of the alleged offense, for which they are here on trial. If, after a consideration of all the evidence, you have a reasonable doubt whether or not either defendant was present at the time that the crime was committed, he is entitled to an acquittal.'' This instruction was proper. (*People* v. *McCoy*, 25 Cal.2d 177, 184 [153 P.2d 315]; *People* v. *Shaw*, 115 Cal.App.2d 597, 603 [252 P.2d 670]; *People* v. *Lewis*, 81 Cal.App.2d 119, 124 [183 P.2d 271].)

Pierce urges that the instructions given were suggestive of the defendants' guilt; that they went beyond the scope of the evidence, and invaded the province of the jury. There is no support in the record for this contention.

■ Defendants allege that the taking of blood samples from them by police officers while they were in custody was a violation of due process of law and of their right against self-incrimination under both the federal and state Constitutions, and that these samples should not have been introduced into evidence. The samples of blood were taken in a medically approved fashion, without objection from defendants. When this evidence was introduced at the trial, their attorneys stated ''no objection.'' There was nothing improper in the introduction of this evidence under the circumstances.

■ Prejudicial error is claimed because of alleged misconduct on the part of the district attorney. In questioning Pierce on cross-examination with regard to his testimony that the defendants had robbed a market in Fresno, the deputy district attorney queried: ''And didn't you go in and grab one chap and hold a knife up against his neck while Jordan

robbed the store?'' No objection to this question was interposed. (See *People* v. *Simeone*, 26 Cal.2d 795, 806 [161 P.2d 369].) When followed, as it was, by a negative answer, the question, although improper, does not require a reversal.

Defendants attack the testimony of witnesses Greenup and Hall regarding the two men they saw on the night of March 28, 1953, contending that their testimony was improbable, vague and incredible. The testimony of these witnesses was not objectionable. While it was shown that Mrs. Greenup had defective vision, she wore glasses for the correction of that vision and was wearing them at the time she witnessed the cab incident. Her observations as to color were not in question, and no error is indicated in the refusal of the court to allow the defense an opportunity at the trial to test her observations as to color. An ability to distinguish color differs from an ability to distinguish dark from light. There was evidence to support her testimony that it was not a dark night; that the men were dark; and that one had a light overcoat.

Evidence of a technical nature was given by an expert witness for the prosecution, Dr. Paul L. Kirk, professor of Criminalistics and Biochemistry at the University of California at Berkeley. Upon the bases of the various tests conducted by him or under his direction as to certain physical evidence, relating principally to blood, hair, fibers, and glass, his conclusions were that there had been a prior contact between the defendants and the deceased, and that the defendants had been inside the latter's cab. His qualifications as an expert were preliminarily objected to and an extensive *voir dire* was conducted as to his qualifications. The court held that he was properly qualified. Thereafter Dr. Kirk testified in minute detail as to the tests conducted, the manner in which they were carried out, the precautions taken to assure accuracy and to prevent contamination of the substances examined, and as to his conclusions that the probabilities were that there had been a prior contact between the clothing of the defendants and that of the deceased, and between the clothing of the defendants and the interior of the cab. He was cross-examined for several days as to every phase of his tests and as to the bases for his conclusions. The defense offered some counterevidence. It is not necessary to here describe these technical experiments. The jury was free to accept or reject the conclusions drawn from them.

On July 30, 1954, two days after the trial commenced,

defense counsel obtained service on Dr. Kirk of a subpoena duces tecum commanding him to bring to the trial ''all original notes, computations, calculations, papers, documents, experimental data, used by him.'' The prosecution replied that it was extremely inconvenient to produce this material. No further attempts were made by the defendants to obtain it. Dr. Kirk's testimony began August 11th. The trial ended August 25th. No request was made at the trial by defense counsel for the production of the slides or the sweepings from which the test materials were extracted. A request was made at the trial for the production of Dr. Kirk's notes but the court properly held that no proper foundation had been laid and the request was denied. On appeal defense counsel have sought to augment the record to present ''newly-discovered evidence,'' alleging that they had no opportunity to anticipate or prepare to meet the testimony of Dr. Kirk, and that lack of funds was part of such lack of opportunity. However no request was made by them at the trial for a continuance or for a court-appointed expert to assist them. Neither defendant waived a jury trial. The record may not thus be augmented on appeal. (*People* v. *Carmen*, 43 Cal.2d 342 [273 P.2d 521].) The nature of the newly discovered evidence is not stated.

█ The gun of the defendants was properly admitted in evidence. There was evidence that it could have been the murder weapon, and defendants admittedly had it in their possession at the time the cab driver was killed. Additionally, as to Pierce, there was his admission that he used the gun to bludgeon the victim.

█ Defendant Jordan urges that the defendants were deprived of their right to a speedy trial because the prosecution failed to obtain an indictment until over a year after the cab murder took place. There is no statute of limitation as to murder. (Pen. Code, §·799.) Defendants were indicted on June 3, 1954, and were brought to trial on July 28th, within the time prescribed by statute. (Pen. Code, § 1382.)

█ The constitutional guarantees of a speedy trial (U.S. Const., VI.Am.; State Const., art. I, § 13) were not violated. One does not become an ''accused'' until the filing of a complaint or other charge. █ At no time did either defendant assert during the trial that he had been denied his right to a speedy trial. It cannot be asserted for the first time on appeal. (*People* v. *Newell*, 192 Cal. 659, 669 [221 P. 622]; *People* v. *Tenedor*, 107 Cal.App.2d 581 [237 P.2d 679].)

■ There is no merit in Jordan's contention that the indictment was defective in that it did not inform the defendants of the charge against them. The indictment charged them with "a felony, to wit, murder, in that on or about the 28th day of March, 1953, in the County of Alameda, State of California, they murdered Charles Rose." This follows the form and language of section 951 of the Penal Code (as am.1927) and is sufficient. (*People* v. *Smith,* 215 Cal. 749, 751 [12 P.2d 945]; *People* v. *Magsaysay,* 210 Cal. 301, 302 [291 P. 582]; *People* v. *Coen,* 205 Cal. 596 [271 P. 1074].) [18] The 1929 amendment to section 952 of the Penal Code, providing that the indictment "may be" in the words of the enactment describing the offense, does not require that murder be pleaded in the words of section 187 defining "murder." The Legislature has legalized the conclusion "murdered" to be pleaded in an indictment. (Pen. Code, § 951.) All forms of pleading in criminal actions and the rules by which the sufficiency of the pleadings is to be determined, are those prescribed by the Penal Code. (Pen. Code, § 948.)

Without further recounting the details of the record or the contentions of the parties, it sufficiently appears that no prejudicial error occurred and that the evidence was sufficient to support the verdicts.

The judgments and orders are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

The petition of appellant Smith Edward Jordan for a rehearing was denied December 28, 1955.