[Crim. No. 5757.   Second Dist., Div. Three.   Sept. 24, 1957.]

THE PEOPLE, Respondent, v. CORNELIUS F. NICHOLS, Appellant.

Robert L. Gardner, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Lynn Henry Johnson, Deputy Attorney General, for Respondent.

WOOD (Parker), Acting P. J.—Defendant Nichols and one Luke were charged with attempted robbery. They were also charged with having been armed, at the time of the offense, with deadly weapons, namely, a pistol and a revolver. Nichols admitted allegations of the information that he had been convicted of felonies on three occasions (grand theft, burglary, and attempted burglary). Luke pleaded guilty. In a trial by jury, Nichols was convicted. The jury also found that the charge that Nichols was armed with a deadly weapon was true. Nichols appeals from the judgment.

Appellant contends that the trial judge erred in rulings as to the admissibility of evidence; and that statements by the judge constituted misconduct and deprived appellant of a fair trial.

On January 22, 1955, about 10 p. m., when Thomas Duff, a clerk in a liquor store, was preparing to close the store, two men entered the store and each of the men had a gun in his hand. One of the men stood in front of Duff and ordered him to close the door. The other man stood at Duff's side. Duff testified that the man who stood at his side was defendant Nichols, and that Nichols was holding a gun about four inches from Duff's side; Nichols was wearing a knee-length topcoat, had his hat pulled down and his coat collar turned up. When Duff was ordered to close the door he went outside and pushed the door shut. Then he ran around the corner and hollered, "Holdup." While he was running the two men were running after him. About that time a police car came along and one of the officers got out and held his gun on one of the men (defendant Luke). The other officer got out of the car and chased the other man down the alley. Duff testified that the other man who ran down the alley was defendant Nichols; and after the officer chased Nichols he (witness) heard three shots fired.

Mr. Farr testified that at the time above mentioned he was near an apartment house (about a block from the liquor store) and he heard two shots; then he saw a man running on the lawn of the apartment house; the man was wearing a topcoat and hat; within a few minutes a police officer ap-

proached, and the witness indicated to the officer that a person was behind a Buick automobile which was parked on the other side of the street; the witness directed the officer's attention to the Buick because the witness had seen a movement near the Buick; the officer went to the Buick and took into custody a person who was hiding behind the car; the person who was taken into custody was wearing a topcoat and a hat.

Officer Brown testified that on said day, about 10 p. m., he and Officer Ward were traveling in a police radio car near the liquor store; he saw a man run out of the store and saw two men, with guns, following him; Officer Ward took one of the armed men into custody; Officer Brown (witness) chased the other armed man, who went into the alley; that man was defendant Nichols; while chasing Nichols, the officer fired three shots; when the officer lost sight of Nichols and stopped near a building, someone who was there told him that the man was behind a car which was across the street; the officer went to the car and arrested Nichols, who was lying behind the car; the officer took a loaded revolver from the pocket of Nichols' topcoat; on the way to the police station Nichols said he was going through the alley and he wanted to stop but after the shooting started he was afraid to stop because he was afraid the officer would kill him; at the station, Nichols said that Luke (other defendant) had a car and they left it near the place where the officer caught Nichols, and that the whole thing was Luke's idea anyway.

Officer Indorf, an investigating officer, testified that on January 24, 1955, Nichols told him that he met Luke at a poker game and Nichols proposed that he and Luke hold up a place and obtain money so that Nichols could send his wife to Cincinnati where there was sickness in the family; that Nichols also said that they decided to take the liquor store, they were armed, they entered the store, the man ran out, they chased him, and the police caught them; that Nichols also said that he was desperate for money.

Defendant Nichols testified that on said January 22 he played poker with Luke and others at a club on Central Avenue from approximately 3:30 p. m. to 6:30 p. m., when he and Luke and one Red left the club; then they went, in Luke's automobile, to the home of Nichols' landlord; then they went to the home of William Bly, arriving there about 9:30 or 9:45 p. m. (apparently the home of Bly was in the vicinity of the liquor store); Nichols went into Bly's house, and Luke and Red went away; Nichols stayed in Bly's house about 15

minutes; then he left that house and started to walk home; after he had walked a short distance he heard what seemed to be backfiring of an automobile and he saw a parked police car on which the red light was blinking; he was reluctant to go farther in that direction because he was an ex-convict and he had been arrested previously at a scene of police activity and held in jail 72 hours; he started back to Bly's house; then a man, who resembled Red, ran past Nichols; Nichols started running toward Bly's house, and when he heard gunshots he went behind the parked automobile and stayed there about five minutes; then the officer arrested him; the officer did not take a gun from Nichols' pocket; Nichols was not wearing a topcoat; he had never been in that liquor store; he did not tell Officer Indorf that he and Luke went to the liquor store to "rob" it.

Bly testified that Nichols was at Bly's house in the evening of January 22, as testified by Nichols.

█ Appellant asserts that the court erred in sustaining an objection to a question which appellant asked Officer Ward. The substance of the question was whether Officer Ward, while holding Luke in custody at the place of arrest, had a conversation with Duff regarding the apparel of the man who ran down the alley. Officer Ward had testified that he saw the man run away and that the man was wearing a tweed topcoat and a brown hat. The objection should not have been sustained. If there had been such a conversation it might have had a bearing on the credibility of the officer's testimony as to the apparel he observed. It cannot be said, however, that the ruling was prejudicial, in view of the testimony of two other witnesses (Duff and Farr) that the man was wearing a topcoat and hat.

█ Appellant also asserts that the court erred in limiting appellant's cross-examination of Duff, on the matter of alleged impeachment, to Duff's testimony at the first trial and by excluding Duff's testimony at the preliminary hearing. (At the first trial, a jury failed to agree on a verdict.) Duff had testified at the present trial that the men who attempted to rob him were about six feet tall and one of them was about two or three inches taller than the other. Preceding the ruling referred to, counsel for appellant (not present counsel) had asked Duff whether he had testified previously that the person who ran down the alley was taller than Luke. Duff replied that he had testified that the tall one ran down the alley. Then counsel for appellant asked Duff to read

a certain portion of the transcript of the first trial, wherein the witness said that the tall slim man ran down the alley. Thereupon there was a discussion by the attorneys and the judge relative to proper procedure in attempting to impeach a witness by his prior testimony. Counsel for appellant said that Duff was mistaken in stating (at the present trial) that the taller man ran down the alley; that he (counsel) wanted to show by the previous testimony that Duff was mistaken; that Duff had testified regarding it at the preliminary hearing and repeated it at the first trial. Thereupon the judge said: "Let's not clutter up the record with the two. If he testified the same at the preliminary let's use this one [transcript of the first trial]." Then counsel for appellant said: "Thank you, your Honor. I will do that. What I was trying to show, at the time of the preliminary, your Honor ——." The judge said: "As far as I am concerned you can read this whole page, skipping that part where it refers to what he testified to at the preliminary hearing." Counsel for appellant said: "All right. Now, what parts?" Thereafter references were made to the transcript of the first trial. Apparently the testimony at the preliminary hearing (regarding the taller man) would have been cumulative. Furthermore, appellant did not object to the direction that the transcript of the first trial be used. It was not error to limit such cross-examination to the use of that transcript.

Appellant asserts that the trial judge made seven statements which, when considered together, constituted judicial misconduct which deprived appellant of a fair trial. Appellant also states that probably no one of the statements would be sufficient, in itself, to prejudice his rights, but the cumulative effect of all of them would be prejudicial. At the trial appellant did not assign any of the statements as misconduct.

The first assignment (on appeal) of misconduct is based upon the following statement by the judge: "Let's have an understanding here that I am not to be argued with. I don't like to be arbitrary, but if I have to, I can. I am not in the habit of having an argument when I make a statement. Now you, Mr. Nichols, step back on the other side of the table. Unless you want to show Mr. Duff an exhibit, you step on the other side of the table. If you want him to put a hat on, have him put it on here." Immediately preceding that statement, while Duff was on the witness stand and while defendant's counsel was near Duff, defendant's counsel asked defendant to "come around here"; then defend-

ant's counsel said that he wanted to see whether there would be any difference in the witness' testimony if defendant had "this hat on." The judge had said that he would prefer that the cross-examination be conducted from the other side of the table. Defendant's counsel then said: "Your Honor, I had to come over here——." It is apparent that the judge, in giving such direction to the defendant and his counsel, was attempting to maintain orderly procedure at the trial. It is also apparent that, after such direction was given, defendant's counsel was proceeding to argue about the ruling. The statement of the judge did not constitute misconduct.

Another such assignment is based upon the following statement by the judge: "I am not going to put up with a lot of argument on these matters. This is an infinitesimal matter. I am not going to permit it. The objection is sustained. There is no variance at all. You just go ahead and ask another question." Preceding that statement, defendant's counsel had asked Officer Brown if he remembered testifying at the first trial that a person "in a window" (of the apartment house) had told him that a man was lying across the street (behind the car). The officer replied in the affirmative. Then counsel for defendant asked if that person was in the window. The officer replied that he did not know, and that it was his "impression" that the man was in the window. Thereafter counsel for defendant asked the officer to look at a certain portion of the transcript and state whether that refreshed his recollection as to whether he "knew" where the person was. The statement of the judge pertained to the distinction between the officer's testimony that the person was in a window and his testimony that it was his impression that the person was in a window. The officer was pursuing a robber, when a person told him that someone was behind a car, and it is relatively unimportant whether the officer "knew" or "thought" that the person who gave the information was in a window. Any impeachment with reference thereto would be insignificant. The statement of the judge did not constitute misconduct.

Another such assignment is based upon the following statement of the judge: "The answer to the question is no." Preceding that statement counsel for defendant had asked Officer Brown if it was his testimony that Nichols did not mention Bly before being booked at the police station. The officer replied that he never heard of Bly until February, 1956. Any criticism that is implied in the statement by the

judge pertains to a nonresponsive answer by a witness for the prosecution. The statement was not prejudicial to defendant.

The four other assignments of alleged misconduct related to comments by the judge which included statements that certain questions asked by defendant were repetitious and immaterial. One of the comments was as follows: "Didn't we go over all this this morning, Mr. Ridley [counsel for defendant]? I don't see the materiality of this. You are talking about something that has never been presented in this proceeding. There is nothing before the jury and there isn't going to be. The tape is lost, but even if it were present what difference does it make? . . . I am ruling on the basis that it is immaterial." Another comment was: "Why don't you ask him right out, 'Did you have another conversation with the defendant after you got to the jail?' Or is that too direct? . . . You can have all the time you want to ask material questions, but you cannot have five seconds on an immaterial matter." Another comment was: "I don't think we will ask that question again. I think five times now this officer has stated he has never heard the name of Bly until the trial last month, in February of this year." Another comment was: "I think we are wasting time again. You turned this man loose once. You asked him everything you could think of and now you are asking him questions again. You are just covering the same ground." It would require extended writing to refer in detail to the various questions, answers, and rulings which preceded those comments by the judge. It may be stated generally that the full context of the reporter's transcript, pertaining to the comments under consideration, shows that there had been prolonged questioning regarding the lost tape, and there had been repetition of questions regarding Bly and conversations. The statements of the judge did not constitute misconduct.

Furthermore, since defendant did not object, during the trial, to any of said statements or assign any of them as misconduct, his assertion on appeal that such statements constitute error or misconduct need not be considered. (See *People* v. *Wissenfeld,* 36 Cal.2d 758, 766 [227 P.2d 833]; *People* v. *Jordan,* 45 Cal.2d 697, 708 [290 P.2d 484]; *People* v. *Tabb,* 137 Cal.App.2d 167, 172 [289 P.2d 858].)

Appellant asserts that the court erred in sustaining an objection to a question which defendant's counsel asked

defendant. The question was, in substance, as follows: "Did your wife have a sufficient amount of money to go from here to Cincinnati . . . when you left home on January 22nd?" Officer Indorf had testified that defendant said that he (defendant) proposed that he and Luke hold up a place and obtain money so that defendant could send his wife to Cincinnati. Defendant argues that evidence that the wife had money would controvert that testimony; and that an issue as to the wife's finances was made when that testimony was given. The testimony of the officer was a part of a conversation which the officer had with defendant. The officer did not testify that it was a fact that defendant needed money so that he could send his wife to Cincinnati—he testified that defendant said that he proposed a holdup so that he could obtain money for that purpose. The fact that the wife had sufficient money for a trip to Cincinnati would not contradict the testimony of the officer that defendant made the statement referred to. In any event the point with reference to the wife having sufficient money for the trip was covered by her testimony. She testified that she and her daughter obtained airplane tickets on January 23 for transportation to Cincinnati; and that after defendant left home on January 22 she did not see him until she returned from Cincinnati about 10 days later. The ruling sustaining the objection to the question was not prejudicial error.

█ Appellant also contends that the court erred in striking out a part of defendant's testimony. Defendant had testified that when he heard the shots and saw the police car and started back to Bly's house, a man, who resembled Red, ran past him. Defendant had also testified that when he saw the person running he (defendant) thought that the person was involved in something that happened where the police car was. Thereupon counsel for defendant asked defendant the following question: "[D]id you then think that something was going on up there and you'd better get back to Bly's house?" The defendant replied: "Well, that is not exactly what gave me that conviction in my mind. It was the fact that when I saw him he also noticed me at the same time and that is when he——." The deputy district attorney moved "to strike that on the ground it is an opinion or conclusion of the witness." The judge said: "Strike out that part of it." The judge also said that the only part that was stricken was the part wherein the witness "attempted to

indicate what was in this other person's mind." The ruling was correct. The statement of the witness was a conclusion as to what the other person noticed.

The purported appeals from the "determination of Mistrial" at the first trial, from the "order for resetting," and from the "resetting" are dismissed. (The notice of appeal was not prepared by present counsel for appellant.)

The judgment is affirmed.

Vallée, J., concurred.