[Crim. No. 479.   Fifth Dist.   Aug. 5, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. BOBBY RAY BRITTON, Defendant and Appellant.

Albert C. Buehler, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J.—Defendant appeals from a conviction of possession of marijuana upon the sole ground the package of marijuana introduced in evidence over his objection was taken from his person by an illegal search and seizure.

At 2 a.m. on December 31, 1966, Deputy Sheriffs Mitchell and Koozin were patrolling in the area of the Jumbo Mart, Florin Street and Power Inn Road, Sacramento County, paying particular attention to the market because of a report that the burglar alarm system was not functioning properly. They saw defendant's Ford and another automobile in the market parking lot; as they approached, the other vehicle left. Defendant circled the lot and drove east on Florin Street. There is no evidence that he was aware of the presence of the patrol car, and the officers had no interest in him or his automobile at that time. Nothing was amiss at the market, but a few minutes later the officers saw defendant's Ford preparing to make a U-turn at Power Inn Road and Florin Street. They decided to see why he remained in the area at that late hour, but they had no intention of arresting him.

The officers drove up behind defendant's automobile and turned on their overhead lights, whereupon defendant pulled to the side of the road and stopped. Deputy Koozin, the passenger in the police vehicle, got out and stood on the driver's side of defendant's car. Deputy Mitchell followed him, remaining out of range of the headlights to cover his partner until there was no indication of danger. Mitchell walked up to the driver's side of the Ford, flashed his light inside and saw the barrel of a gun protruding six or eight inches from under the front seat. Subsequent investigation disclosed a broken .22 caliber rifle, completely inoperative, a fact unknown to the officers at the time. Defendant had the odor of liquor on his breath but was not belligerent, and complied when he was ordered out of the car. Deputy Mitchell testified that then a "regular frisk search" for weapons took place. However, the officers ordered defendant to remove all articles from his clothing and place them on the trunk of the car; after that, Deputy Koozin patted his clothing to be certain he was not armed. Koozin felt a soft bulge on the left side of defendant's jacket and observed an object protruding from the pocket. He asked defendant what it contained, and defendant replied, "I don't know." Koozin removed the package and handed it to Officer Mitchell, who unwrapped three plastic or cellophane bags, one inside the other, and found that the innermost bag contained a vegetable substance which the officer thought to be marijuana. It was, and at the trial the package was introduced in evidence over the objection of defendant. ▮▮▮ . The whole point of this appeal is whether the package was obtained by an illegal search.

It is clear that at the time the officers stopped defendant they did not intend to arrest him; they merely decided to question him because of his activities noted above, which aroused their suspicions. Thus the admissibility of the package rests upon the legality of the search conducted by the officers when they stopped defendant for questioning.

The United States Supreme Court recently came to grips with the question of an officer's right to "frisk" or "pat down" in circumstances short of an arrest and concurrent search. (*Terry* v. *Ohio*, 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *Sibron* v. *New York*, 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889]; *Peters* v. *New York*, 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889].) The first case of the trilogy, *Terry* v. *Ohio*, postured the problem within the context of the Fourth Amendment proscription against unreasonable searches and seizures, made applicable to the states by the Fourteenth Amendment. (*Mapp* v. *Ohio*, 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].) The court commented, at page 1877 [392 U.S. at p. 16, 20 L.Ed.2d at p. 903] of *Terry*: "Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. . . . There is some suggestion in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for a crime—'arrests' in traditional terminology. . . . it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.' "

After noting the sanctity of the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, the court pointed out that the Fourth Amendment protects people, not places, and this protection applies to an on-the-street encounter between the citizen and the police. The court then turned to the other aspect of the problem, the right of a police officer to protect himself by a frisk or pat down of a suspect before questioning, and concluded: ". . . we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they

may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'' (P. 1881 [392 U.S. at p. 24, 20 L.Ed.2d at p. 907].)

Confrontations between the police and the citizen, the court observed, range from friendly intercourse to a strong suspicion that the person has committed a crime. Because of this broad spectrum of encounter, no general formula can tell us in advance where the line is to be drawn between an individual's right to protection under the Fourth Amendment and the policeman's right to protect himself and others by a frisk. However, guidelines for determining whether the officer used reasonable judgment in making a ''frisk'' in a particular case, are laid down in *Terry*. These criteria point to a pragmatic resolution of the conflict between the overlapping concepts of the Fourth Amendment protection against unreasonable search and seizure, and the police officer's need to protect himself and others. The court explained, in *Terry*, that the test is ''a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstance which justified the interference in the first place.'' (P. 1879 [392 U.S. at p. 20, 20 L.Ed.2d at p. 905].)

The first half of the test, ''whether the officer's action was justified at its inception,'' was given the following explication: ''Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations.] And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in the

light of his experience." (P. 1883 [392 U.S. at p. 27, 20 L.Ed.2d at p. 909].)

When measured by the standard of the "reasonably prudent man" the officers' decision to stop defendant for questioning was justified. They had been advised that the burglar alarm at the store was not working properly, which alerted them when they observed defendant on the market parking lot at 2 a.m.; they noticed that he circled the lot before leaving, which was unusual, that he drove a short distance along a street, made a U-turn and returned to the market area. In such circumstances the officers were warranted in stopping defendant to question him about his unusual conduct at that hour of the morning, even though they had no cause to arrest him. (*Ballard* v. *Superior Court,* 64 Cal.2d 159, 169, fn. 3 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52].) When the officers saw the barrel of the .22 rifle protruding from under the front seat, they were indeed justified in making a frisk or "pat down" of the driver before questioning him.

Having established that the frisk was justified, the second part of the bifurcated test comes into play, "whether it was reasonably related in scope to the circumstance which justified the interference in the first place." This language was given articulation in *Terry,* at page 1882 [392 U.S. at p. 25, 20 L.Ed.2d at p. 908], as follows: "A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. [Citation.] Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others near by, and may realistically be characterized as something less than a "full" search even though it remains a serious intrusion."

Before discussing the scope of the frisk conducted by the officers, we note, parenthetically, that the fact marijuana was found and defendant's arrest followed does not justify the search; it has been held repeatedly that a search cannot be justified by what it turns up. (*People* v. *Brown,* 45 Cal.2d 640, 643 [290 P.2d 528].)

The scope of the search made by the officers can best be related through their own testimony. Officer Mitchell testified:

"Q. And at that point you searched him? A. Yes, sir.

"Q. And on the search, was this just a general patting-down to see whether or not he had any weapons? A. It was your regular frisk search.

"Q. All right. And what is the purpose of this search, only to find out if he had weapons on him? A. Yes, sir.

"Q. Did the officer—did you observe the officer taking the wallet out of Mr. Britton's pocket? A. We did have Mr. Britton empty his pockets, sir.

"Q. Uh huh. A. No, I don't know if my partner took the wallet out or if Mr. Britton took the wallet out. I do know we did have his pockets emptied up on the trunk of the car, and that's when we patted him down."

And again:

"Q. Did you empty all of his pockets completely? A. Yes, sir.

"Q. Uh huh. A. All of his pants and shirt pockets. I'm not certain, I don't think we emptied the jacket pockets.

"Q. And did you open a small plastic bag that you found on or near him? A. Yes, sir.

"Q. Did you open the bag to find out whether there was a weapon in it? A. I opened it to find out what was in it, sir.

"Q. Did you suspect there was a weapon of some type in it? A. I didn't know what was in it, sir.

"Q. Could the little bag have contained a revolver of any type? A. Not a revolver, no.

"Q. Did you pat it before taking it out of his pocket? A. Yes, sir.

"Q. And was it soft? A. Now, what do you mean by soft, sir?

"Q. By soft I mean, oh, malleable as contrasted from hard-metal type? A. Yes, sir.

"Q. As it was pulled out of the pocket, could you tell whether or not this was pipe tobacco or anything of that, like that, at that particular time? A. I couldn't tell what it was, sir. That's the reason I opened the bag."

The officer who actually removed the plastic bag from defendant testified as follows:

"Q. During this search, is that when you came up with the plastic bag which you said you found, which was similar there? A. Yes, I was patting him down and felt the bulge and saw the plastic bag hanging over the pocket, and I asked him what it was, what this was, and he said, 'I don't know.'

"Q. All right. Now at any rate, it was during this search for a weapon when you ran across the bag? A. Yes, sir.

"Q. And you ran across this, removed it, and gave it to Mitchell? A. Yes, sir.

"Q. Then, after removing that and giving it to Mitchell, did you continue to search for weapons? A. Yes, sir."

By requiring defendant to empty his pockets and by removing from his pocket a soft pouch which had no possible use as a weapon, the search exceeded the bounds of a permissible "frisk." In *Sibron* v. *New York, supra,* page 1904 [392 U.S. at p. 65, 20 L.Ed.2d at p. 936], the Supreme Court reiterated the narrow compass within which the right to frisk is confined: "The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault."

■ There remains the critical question whether exceeding the scope of a permissible frisk requires exclusion of the contraband seized. It would appear that the exclusionary rule which was adopted to insure observance of Fourth Amendment protections would likewise be employed to confine stop and frisk intrusions upon those protections to the narrow limits fashioned by the court. *Terry* pointedly says: "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. [Citation.] Thus its major thrust is a deterrent one [citation], and experience has taught that it is the only effective deterrent to police misconduct in the criminal context, and that without it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.' " (P. 1875 [392 U.S. at p. 12, 20 L.Ed.2d at p. 900].)

Certainly if the exclusionary rule is not applicable the temptation is open to circumvent the Fourth Amendment by turning a stop and frisk into a full-blown search.

■ Since the search of defendant exceeded the permissible bounds of a "frisk" under the principles formulated by the United States Supreme Court in *Terry* and articulated in *Sibron,* it must follow that the fruits of such search are inadmissible under the exclusionary rule adhered to by the United States Supreme Court and the California Supreme Court.

The judgment is reversed.

Conley, P. J., and Gargano, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 3, 1968.