[Crim. No. 15373. Second Dist., Div. One. Dec. 16, 1968.]

THE PEOPLE, Plaintiff and Appellant, v. CANDIDO
DURAN ARMENTA, Defendant and Respondent.

Thomas C. Lynch, Attorney General, William E. James,
Assistant Attorney General, Evelle J. Younger, District Attor-
ney, Harry Wood and Eugene D. Tavris, Deputy District
Attorneys for Plaintiff and Appellant.

Richard S. Buckley, Public Defender, Paul A. James and

James L. McCormick, Deputy Public Defenders, for Defendant and Respondent.

FOURT, J.—This is an appeal by the People from an order granting a motion to suppress the evidence under the provisions of section 1538.5 of the Penal Code.

In an information filed in Los Angeles on April 1, 1968, defendant was charged with possessing heroin for sale on March 14, 1968. It was further charged that defendant previously had been convicted of a felony (assault by means of force likely to produce great bodily injury) in 1958 in Los Angeles and had served a term therefor in the state prison. Defendant admitted the charged prior conviction. Defendant made a motion under section 1538.5 of the Penal Code and the same was granted. The motion to suppress was submitted upon the transcript of the testimony taken at the preliminary hearing. The case was dismissed and a timely appeal was filed by the People.

A résumé of some of the facts is as follows: Deputy Sheriffs Guerra and Callas on March 14, 1968, at about 12:20 a.m. were patrolling in a marked sheriff's patrol car. They observed the defendant driving a 1957 Ranchero vehicle and observed that he committed several traffic violations, including among others, driving across a double line. The officers caused the defendant to stop as a result of the violations. Guerra got out of the sheriff's car and approached defendant's vehicle on foot. Defendant was the sole occupant of the Ranchero vehicle. Guerra asked defendant for his driver's license and defendant pulled out his wallet and fumbled through it, took a piece of paper therefrom, crumpled it up and threw it to the floorboard. Defendant then handed the officer his driver's license with his right hand but as he did so defendant crouched forward and placed his left hand toward the lower middle portion of his body. Defendant "fumbled with his left hand in the right front portion of his body." The motion appeared to the officer to be suspicious. Guerra asked defendant if he was the owner of the car and thereupon defendant opened the door of the Ranchero and got out. As he did so the officer observed that defendant leaned against the vehicle. The officer detected an odor of alcohol from defendant. Guerra intended then to conduct a test to ascertain whether defendant was under the influence of some intoxicating liquor and to cite him for the previously observed traffic violations. He "noticed a bulge in the lower portion beneath the belt of Mr. Armenta's trousers,

on the inside of the trousers." He suspected that the bulge which was "Right below the center of the belt, the front portion" might be a weapon of some sort. The officer started a pat-down search for weapons and when he got to the area of the bulge asked defendant, "What do you have in here?" Defendant then shoved the officer back, took some steps backward "and started to place his hand inside his trousers." Guerra grabbed defendant's right wrist, told him to keep his hands away from the inside portion of his trousers and again asked "what the bulge was." Defendant again attempted to shove Guerra back and Deputy Callas held defendant against the vehicle. Guerra reached into defendant's trousers and pulled out some paper wrapping in which were two containers which appeared to contain heroin. The packaging contained about two ounces of heroin, sufficient to make up about five hundred capsules of Number Five gelatine capsules, the retail market value of which would be about $1,000. Defendant was arrested for the possession of heroin for sale.

At or about the time of the arraignment in the trial court defendant through his counsel made a motion to suppress the evidence pursuant to section 1538.5 of the Penal Code. It was stipulated by all concerned that the matter would be heard upon the testimony taken at the preliminary hearing. No further witnesses were called or examined. Defense counsel stated:

"MR. JAMES: It is our position that from the preliminary hearing transcript evidently the defendant was stopped for a traffic violation. There was a bulge of some sort around the waistline of the individual. He shoved the officer back when the officer went to reach for his body, or this item, at some point.

"Evidently, from the transcript, the officer touched the upper part of his body and then got down to the middle waistband of his body, grabbed hold of the left hand. The other officer had hold of the right hand.

"It is our position that they could have, under those circumstances, continued the pat down search that they are entitled to do under the law, but when they went inside his clothing and removed this item, that they went beyond the pales of the law of the pat down search, and therefore invaded his constitutional rights of search and seizure.

"We therefore feel, based upon those facts in this transcript, that they went too far when they went inside his clothes and the product of that search would be illegal."

The judge granted the motion upon the ground of illegal search and seizure. The cause was then called for trial and the court dismissed the matter. A timely notice of appeal was filed.

■ Respondent now asserts in effect that the object which made the bulge in this instance was a "soft object" and that "only upon feeling a hard object" may the officers continue a further search for weapons or continue to attempt to ascertain and determine what it was which caused the bulge.

In this case under the circumstances there is no conflict in the evidence or the facts or the inferences arising therefrom. Defendant did not testify and apparently was fully satisfied to rely upon the testimony taken at the preliminary examination. Under these circumstances the question is what legal conclusions may be drawn from the facts and the inferences therefrom. (See *Pinizzotto* v. *Superior Court,* 257 Cal.App. 2d 582, 590 [65 Cal.Rptr. 74].

What the public defender argues is tantamount to saying to the criminal suspect that if he can think of anything soft to carry, although lethal, it will be protected from any search for weapons for the reason that it is soft and not hard. This the respondent asserts in spite of the fact that the item made a definite bulge in the wearing apparel of the suspect and the officer reasonably believed from the furtive conduct of the suspect that he was armed with some sort of a weapon which if used could be fatal to the officer. In short, a rubber water pistol loaded with carbolic acid or some other liquid, which if used by a suspect could permanently blind an officer, should be protected from a "pat down search" because it is "soft" and not "hard." We are persuaded that such is not the law.

Section 833 of the Penal Code provides in part, "[a] peace officer may search for *dangerous weapons* any person whom he has legal cause to arrest, whenever he has reasonable cause to believe that the person possesses a dangerous weapon." (Italics added.) It is noted that the Legislature simply stated "dangerous" weapons and made no attempt to distinguish further between a hard dangerous weapon and a soft dangerous weapon or to restrict the search if the dangerous weapon were of the soft variety. The facts of this case dictate clearly that the search performed by Officer Guerra was not a complete exploratory search for whatever evidence of criminal activity the officer might find. It was purely a frisk to find any weapons which Armenta might possess. There was however probable cause in this case to make an arrest—indeed, in the immediate presence of the officers Armenta had committed

several vehicle violations which justified his immediate arrest.

It appears to us that an officer is not limited in the frisk or pat-down search to locating "hard" firearms or knives but under certain circumstances can ascertain whether the suspect possesses any other instrumentality which might be used to assault an officer or to effect an escape. To expect an officer of the law to give every suspect the advantage and to take unnecessary risks to himself in the performance of his duties is completely unreasonable. It is appropriately stated in the FBI Law Enforcement Bulletin of November 1968: "As a rule, men who have no respect for the law have nothing but contempt for those charged with enforcing it. Thus, the law enforcement officer's task becomes harder and his personal safety diminishes as more crimes are committed and less criminals are brought to justice."

By way of supporting this statement it is set forth: "Last year, 76 police officers were killed in the line of duty. This is 19 more than the number slain in 1966. Since 1960, 411 law enforcement officers have been murdered, an average of more than 51 per year. Of the 539 offenders involved in these killings, 77 percent had been previously arrested and 67 percent had been previously convicted. Two-thirds of the police killers previously convicted had been granted parole or probation, and 3 out of 10 were actively on parole or probation when they killed a police officer.

"Along with the ever-present danger of death, the enforcement officer faces personal injury with increasing frequency. Encouraged, no doubt, by judicial leniency and public indifference, more and more suspects resist arrest and resort to violence when approached by officers. In 1967, almost 14 of every 100 police officers were assaulted, an increase of 11 percent over 1966."

And as said in *People* v. *Strelich*, 189 Cal.App.2d 632, 635 [11 Cal.Rptr. 807]: "An officer has a right to forestall the efforts of an arrestee to reach for a weapon, to require the arrestee to keep his hands in sight and then to take and examine anything that may be found on his person. The tragic record of the deaths of peace officers who have allowed suspected persons an opportunity to use a weapon and the usual practice of sending two or more officers together to make an arrest of an ex-convict, or other supposedly dangerous character, prove not only the right of officers to use all reasonable means to protect themselves but the necessity that they do so in order that they be saved from untimely death, and other humans be saved from the gas chamber. [Citation.] The right

to search for dangerous weapons in connection with an arrest 'is not to be doubted.' [Citation.] This has been the statutory law since 1872. Section 846 of the Penal Code provides: 'Any person making an arrest may take from the person arrested all offensive weapons which he may have about his person, and must deliver them to the magistrate before whom he is taken.' Conditions of today make it more than ever imperative that peace officers protect themselves from the 'fast draw' which the youth of the country are being encouraged to believe in and practice as a supposedly manly accomplishment.

"The Legislature wisely enacted section 833 of the Penal Code in 1957, which reads as follows: 'A peace officer may search for dangerous weapons any person whom he has legal cause to arrest, whenever he has reasonable cause to believe that the person possesses a dangerous weapon. If the officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, when he shall either return it or arrest the person. The arrest may be for the illegal possession of the weapon.' "

█ The fact in this case that the pat-down search turned up two ounces of heroin instead of a weapon is of no consequence and did not render the heroin inadmissible in evidence. The officer was not required to blind himself to the heroin simply because it was disconnected from the initial purpose of the search. (See *People* v. *Kraps,* 238 Cal.App.2d 675 [48 Cal.Rptr. 89].)

In any event there is nothing in the evidence or the record to indicate that the bulge in the pants of Armenta was hard or soft or how it felt to the officer.

The orders made and appealed from are reversed.

Wood, P. J., and Lillie, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 13, 1969.