[Crim. No. 11529. In Bank. Dec. 12, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
MERLE MARK MOSHER, Defendant and Appellant.

## COUNSEL

Carl B. Shapiro, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and John T. Murphy, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**TOBRINER, J.**—On September 28, 1966, the Grand Jury of Alameda County indicted the defendant Merle Mark Mosher for the murder of Edith Christie (Pen. Code, § 187) and charged defendant with a prior conviction of statutory rape in 1960 (Pen. Code, § 261, subd. 1). Defendant admitted the prior conviction and pleaded not guilty and not guilty by reason of insanity to the murder charge.

In a separate proceeding the trial court found the defendant mentally

competent to stand trial. The jury found the defendant guilty of murder in the first degree, held the defendant sane at the time of the offense, and fixed the penalty at death. The appeal to this court is automatic. (Pen. Code, § 1239, subd. (b).)

We shall point out why we have concluded that the judgment convicting the defendant of first degree murder must be reversed because the trial court inadequately instructed the jury as to voluntary and involuntary manslaughter and the specific intent required for felony murder in the context of Mosher's diminished capacity defense. (*People* v. *Graham* (1969) 71 Cal.2d 303, 314-317 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Conley* (1966) 64 Cal.2d 310, 318-326 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 729-731 [31 Cal. Rptr. 225, 382 P.2d 33]; see generally, *People* v. *Ketchel* (1969) 71 Cal.2d 635, 641 [79 Cal.Rptr. 92, 456 P.2d 660]; *People* v. *Castillo* (1969) 70 Cal.2d 264, 268-271 [74 Cal.Rptr. 385, 449 P.2d 449].)

Particularly, the judgment must be reversed because the court did not properly instruct the jury as to the elements of voluntary manslaughter in a case in which the defendant asserted the defense of diminished capacity. The trial court instructed the jury on voluntary manslaughter using only the language of subdivision 1 of Penal Code section 192: "upon a sudden quarrel or heat of passion." ▊ In so limiting the instruction the court erred, for, as we have previously noted, the statutory requirement is "the unlawful killing of a human being *without malice*." (Italics added.) (Pen. Code, § 192.) Thus, in order to give effect to the statute when evidence of diminished capacity has been introduced, the jury must be instructed that if it finds the defendant could not harbor malice aforethought because of a mental disease, defect, or intoxication the homicide cannot be an offense higher than manslaughter. (*People* v. *Conley, supra,* 64 Cal.2d 310, 318.)[1]

Finally, the trial court erred in failing to instruct the jury that defendant's diminished capacity might rebut each of the specific kinds of intent

---

[1] In *People* v. *Conley, supra,* 64 Cal.2d 310, we pointed out that section 192 had been adopted before the concept of diminished capacity had been developed and therefore that section's enumeration of nonmalicious criminal homicides could not be considered exclusive. We did not thereby create a "non statutory crime," nor could we do so consistently with Penal Code section 6. Rather we gave effect to the *statutory* definition of manslaughter by recognizing that factors other than sudden quarrel or heat of passion may render a person incapable of harboring malice. (Cf. McBride, *Something New, Non Statutory Crime?* (1969) 44 State Bar J. 579.)

necessary to a finding of a killing in the perpetration of or an attempt to commit rape, burglary, or robbery, and hence, might rebut the prosecution's felony-murder theory of first degree murder. (*People* v. *Ketchel, supra,* 71 Cal.2d 635, 641.)

The failure to give such instructions in the light of the diminished capacity defense deprived defendant of his "constitutional right to have the jury determine every material issue presented by the evidence" and requires the reversal of defendant's murder conviction. (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730.) We do not find the failure to give such instructions to be invited error. (See *People* v. *Graham, supra,* 71 Cal.2d 303.)

We point out the lack of merit in defendant's remaining contentions.

### 1. *The Facts*

The homicide occurred during the early morning hours of August 2, 1966, in an apartment in Oakland where the decedent, Mrs. Edith Christie, lived alone. The evidence against defendant is exclusively circumstantial.

On August 1, 1966, Mrs. Christie and her niece, Mrs. Brooker, had lunched and then shopped in Oakland. About 4:30 p.m. Mrs. Brooker returned Mrs. Christie to her apartment. At 3:45 a.m. on August 2, 1966, a taxi driver received a call to pick up Mrs. Christie at her apartment. Mrs. Christie walked unsteadily toward the taxi and the driver assisted her to the vehicle and drove her to Peralta Hospital. Dr. Willard Peterson, Mrs. Christie's personal physician for seven years, arrived at Peralta Hospital sometime between 4 and 4:30 a.m. He observed a large hematoma about her face; she was gagging. He had never previously treated her for such physical injuries. She died in surgery that morning at 9 a.m.

A pathologist examined the deceased at the coroner's office at 2:30 p.m., August 2, 1966. He noted abrasions and cuts about the head, and injuries to the body. Numerous ribs had been fractured. The injuries were consistent with a beating by fists and feet and had not been caused by a fall. The pathologist concluded that the cause of death was a subdural hemorrhage of the brain due to trauma.

At the time of the death defendant was 30 years old. He had the equivalent of three years of college education. He had worked his way through the first few years of college at part-time night jobs. Then he had fallen behind in his studies, his grades had suffered, he had changed his major from music to education, and he had dropped out of school. He was

involved in two serious automobile accidents in August and December 1960. After each accident he had remained unconscious for several hours. As a result of two barroom brawls defendant, in November 1961, had been committed for psychiatric care to Mendocino State Hospital where he remained until April 1962. Thereafter he continued on home-leave status until December 1963.

After his release from the hospital defendant held several jobs selling encyclopedias and kitchenware. In July 1966 the encyclopedia company suspended defendant for two or three weeks. Defendant's supervisor followed the customary practice in such cases, lending defendant his salesman's identification card so that defendant could continue to work during the period of suspension. According to the testimony of the supervisor and his wife, in addition to defendant's setback at work defendant was in the process of breaking up his relationship with his fiancee, Miss Marlene Norman. Defendant began to appear morose and depressed, particularly as a result of the collapse of the engagement. On August 1 the supervisor gave defendant some $50 as commission for sales defendant had theretofore transacted. The supervisor went to pick up defendant at 5 p.m. to start work, but defendant appeared to be disoriented and did not want to work that day.

Defendant ate dinner at his apartment about 9 p.m. and at about 11:30 p.m. walked to a neighborhood bar. Defendant visited several bars that evening and consumed about five or six drinks of whiskey before closing time at 2 a.m.; after the automobile accidents in 1960 defendant had become a heavy drinker. When subsequently interrogated he could not remember anything of the night's events except that he had started walking home and while on the street two Oakland police officers had questioned him.

Mrs. Darnall lived in an apartment building about three blocks from Mrs. Christie's apartment. About 3:30 a.m., August 2, 1966, she awoke as a result of a pounding on the back door of her apartment. She heard footsteps going down the stairs and she saw defendant at the foot of the stairs. She asked him what he was doing there and he replied that he was looking for "Marlene." Mrs. Darnall informed him that there was no one by that name in the building. After some dispute with defendant concerning his wanting to use a telephone, Mrs. Darnall slammed her door shut; she got her only lighted view of defendant as he walked down the front walk, some 25 feet away. Mrs. Darnall's daughter phoned the police, asking them to investigate the prowler. Defendant visited four other persons in the area in a similar fashion during those same early morning hours.

In response to the phone call from Mrs. Darnall's daughter, Oakland

Police Officers Gardner and Price arrived about 3:40 a.m. to investigate the prowler report. Mrs. Darnall described the man she had seen as white, heavy set, broad-shouldered, and of an average height of about 5 feet 9 or 10 inches. She said he was wearing a dark suit and a white shirt and had taken off his coat. She saw no bloodstains on his shirt and she could not remember whether he had worn a tie. The officers commenced a systematic search on foot, checking backyards, stairways, and areas behind the buildings. At 4 a.m., and a few blocks away, they observed a man matching Mrs. Darnall's description of the visitor, except that he was wearing a suit coat. Sergeant Price ordered the man, who was defendant, to halt. When asked what he was doing, defendant replied that he was going home to Fairmont Street. Fairmont Street lay quite far from where the officers found defendant.

The officers commenced a pat-down search for weapons. Sergeant Price felt in the suspect's lower left coat pocket "a sharp object like a knife blade." The officer pulled a gold watch with bracelet from defendant's pocket and asked defendant where he got it. Defendant indicated that he did not own the watch, but refused to say where he had obtained it. The officers also found a large ring of keys and a wallet with identification for Mark Mosher and for Mr. Tiner, defendant's supervisor. There was a bloodstain on the center panel of defendant's shirt, his hands were cut, and his breath had an odor of alcohol. The officers placed defendant under arrest for suspicion of burglary, handcuffed him, and took him to Mrs. Darnall's apartment for identification. Mrs. Darnall viewed the defendant from the same vantage point from which she had first seen him, and identified him as the prowler.

The watch found in defendant's pocket was later identified as the watch which Mrs. Christie was wearing the day before she died. The keys found in defendant's pockets belonged to the owner of several apartment houses in the area who had left his keys in the glove compartment of his car. He noted that they were missing, and discovered that someone had entered the laundry room of one of his apartment buildings without permission. The stain on defendant's shirt contained type A blood. Mrs. Christie's blood was type B. Defendant's blood type was not tested; the prosecution presented no explanation for this omission. Mrs. Christie's nightgown contained stains of type B blood; her purse and defendant's coat pocket had been stained by both type A and type B blood. No identifiable fingerprints of defendant were found in the deceased's apartment.

For the limited purpose of showing defendant's state of mind as it might bear on purpose or motive, or on plan, design, or characteristic behavior pattern, the prosecution introduced the testimony of a victim of rape allegedly committed by the defendant on January 27, 1966. The defense

introduced the testimony of Dr. Clarence S. Miller that defendant was unable to form the necessary specific intent to commit any of the offenses charged because of his diminished capacity. The doctor examined defendant, his family, and his fiancee; he further reviewed defendant's prior psychiatric records and all other available material. Dr. Miller concluded that defendant had suffered a "black-out" or an acute "episodic state of mind" on the morning of August 2, 1966, and that defendant had a "schizophrenic reaction, paranoid type."

In rebuttal, Dr. Walter Rapaport testified that he had examined defendant on the afternoon of August 2, 1966, at the request of the district attorney. The doctor had first introduced himself and had then warned defendant that he could remain silent, that he could talk to counsel before deciding whether to proceed with the examination, and that the doctor would testify as to his findings if requested to do so. Defendant did not object and the doctor concluded that defendant understood the warnings. After examination the doctor concluded that defendant could formulate an intent to commit robbery and was not insane.

The jury returned a verdict of guilty of first degree murder, and in the subsequent proceedings found defendant to be legally sane at the time of the commission of the crime; at the penalty phase the jury returned a verdict of death.

### 2. *Defendant's defense of diminished capacity*

Defendant raised the defense of diminished capacity. (See, e.g., *People* v. *Conley, supra,* 64 Cal.2d 310; *People* v. *Modesto, supra,* 59 Cal.2d 722; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53].) The trial court properly instructed the jury that diminished capacity may prevent the defendant from forming any of the specific mental states which are essential elements of murder, and may prevent premeditation, malice, willfulness, or deliberation which are necessary to a finding of murder in the first degree.

The trial court instructed the jury on the elements of first and second degree murder in accordance with Penal Code sections 187-189. The court also defined voluntary manslaughter as "the intentional and unlawful killing of a human being without malice aforethought upon a sudden quarrel or heat of passion, without deliberation or premeditation." The court proceeded to inform the jury that manslaughter is distinguished from murder in that the former occurs when malice is rebutted, when the mortal blow is struck in the heat of passion or in a sudden quarrel such as amounts to adequate provocation.

The court informed the jury that it should not find defendant guilty of murder if it determined that malice was rebutted by evidence of the defendant's diminished capacity. But the court proceeded to define manslaughter in such a way as to exclude the jury's consideration of manslaughter as the offense for which the jury should find defendant guilty if it determined that malice was rebutted by evidence that the defendant's mental capacity was diminished due to mental defect, mental illness, or intoxication.

In *People* v. *Castillo, supra,* 70 Cal.2d 264, 268-271, we required the rendition of this excluded instruction to inform the jury as to the elements of voluntary manslaughter in a case in which the defendant asserted the defense of diminished capacity, but the court had instructed only in the language of subdivision 1 of Penal Code section 192. There, as in *People* v. *Conley, supra,* 64 Cal.2d 310, we held that the court should have instructed explicitly that a verdict of voluntary manslaughter may be returned due to diminished capacity. (70 Cal.2d 264, 270.)

The trial court in the present case merely explained manslaughter in terms of its statutory elements as found in Penal Code section 192. The inadequacy of such an instruction lies in its failure properly to explain to the jury the existence of the above described means by which malice may be rebutted and a verdict of manslaughter returned. As in *Castillo* and *Conley,* we must hold this error prejudicial per se since the defendant has suffered the denial of a jury trial on all of the issues presented by the evidence. (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730-731.)

The trial court also erred in failing to instruct the jury on the aspects of involuntary manslaughter in the context of a diminished capacity defense. (See *People* v. *Graham, supra,* 71 Cal.2d 303; *People* v. *Castillo, supra,* 70 Cal.2d 264; *People* v. *Conley, supra,* 64 Cal.2d 310.) The court instructed the jury that it should not find defendant guilty of murder if it determined that malice was rebutted by evidence of defendant's diminished mental capacity. But the court proceeded to define involuntary manslaughter in such a way as to exclude the jury's consideration of involuntary manslaughter as the offense for which the jury should find defendant guilty if it determined that the defendant's mental capacity was diminished due to mental defect, mental illness, or intoxication such that the intent to kill as well as malice was rebutted. (See *People* v. *Conley, supra,* 64 Cal.2d 310, 323-324.)

The court defined involuntary manslaughter as the "unlawful killing of a human being without malice aforethought during the commission of a misdemeanor which is inherently dangerous to human life or safety." (See Pen. Code, § 192, subd. (1).) The court distinguished misdemeanor and felony, but failed to relate the diminished capacity to the possibility of involuntary manslaughter.

█ Once facts are adduced which would constitute a basis for finding that defendant had both diminished capacity due to mental defect, mental illness, or intoxication, and also unconsciousness or lack of the intent to kill, the trial court fails in its duty to instruct the jury as to all issues of law raised by the evidence (*People* v. *Jackson* (1963) 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937]) if it does not supplement the statutory definition of involuntary manslaughter. It must also instruct that if, due to diminished capacity the defendant had neither malice nor intent to kill, the offense could be no greater than involuntary manslaughter. Without this instruction the trial court deprives defendant of his "constitutional right to have the jury determine every material issue presented by the evidence." (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730.)

If upon retrial the evidence indicates that defendant was unconscious at the time of the offense due to voluntary intoxication, the trial judge should give this supplemental instruction on involuntary manslaughter. (*People* v. *Graham, supra,* 71 Cal.2d 303, 316-317; *People* v. *Baker* (1954) 42 Cal.2d 550, 575 [268 P.2d 705].) In addition, if upon retrial the evidence indicates that defendant was unconscious at the time of the offense for reasons outside his control, the trial court should render an instruction on unconsciousness. (Pen Code, § 26, subd. 5; *People* v. *Wilson* (1967) 66 Cal.2d 749, 761 [59 Cal.Rptr. 156, 427 P.2d 820].)

█ The trial court instructed the jury on the felony-murder doctrine in the context of "the perpetration or the attempt to perpetrate rape, robbery, or burglary." The court proceeded to define the three underlying felonies of rape, robbery, and burglary. The court also defined the concept of attempt as the union of specific intent to commit the crime and a direct, but ineffectual, act done towards its commission which is greater than mere preparation and yet less than the actual completion of the criminal act. The trial court, however, failed to instruct the jury that diminished capacity might rebut each of the specific intents required for the perpetration or attempt to perpetrate rape, robbery, or burglary, and hence might prevent the jury from finding defendant guilty of first degree murder under the felony-murder doctrine.

Instead, the trial court only instructed the jury that "you must consider

what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder, upon which subject you have heretofore been instructed." The trial court had earlier defined murder as "the unlawful killing of a human being with malice aforethought. The word, aforethought, means only the intent must precede the act as distinguished from afterthought. . . . As used in connection with murder, malice may be either express or implied. Malice is expressed when there is an intention to kill a human being. Malice is implied when the killing results from an act involving a high degree of probability that it will result in death, which act is intentionally done for a base, antisocial motive and with wanton disregard for human life, or when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life." The jury upon hearing the court's instruction concerning the effect of diminished capacity upon the formation of the "specific mental states that are essential elements of murder" might well have understood the instruction to apply only to deliberate and premeditated first degree murder and not to the specific intents to commit or attempt to commit rape, robbery, or burglary.

■ As we recently observed in a case concerning a killing in the perpetration or attempt to perpetrate robbery: "In cases in which the prosecution advances a felony-murder theory, defendant is entitled, upon a sufficient factual showing, to instructions negating a conviction on a felony-murder theory if, at the time of the alleged offense, defendant could not form the specific intent—here, the intent 'to permanently deprive the owner of his property'—that serves as a necessary element of the felony charged." (*People* v. *Ketchel, supra,* 71 Cal.2d 635, 641; *People* v. *Ford* (1966) 65 Cal.2d 41, 58, fn. 9 [52 Cal.Rptr. 228, 416 P.2d 132].)

In the present case the prosecution advanced the felony-murder theory as to robbery, rape, and burglary. Defendant adduced a proper factual showing of diminished capacity which might negate his intent "to permanently deprive the owner of his property" (cf. *People* v. *Ketchel, supra,* 71 Cal.2d 635, 641), to enter the house of another with the intent to commit a felony (cf. *People* v. *Sears* (1965) 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938]), or to commit an act of sexual intercourse with force upon a woman not his wife (cf. *People* v. *Bard* (1968) 70 Cal. 2d 3, 5-7 [73 Cal.Rptr. 547, 447 P.2d 939].)

By failing to instruct the jury that defendant's diminished capacity might rebut each of the specific intents necessary to a finding of a killing in the

perpetration or attempt to perpetrate rape, burglary, or robbery, and hence rebut the prosecution's felony-murder theory of first degree murder, the trial court deprived defendant of his constitutional right "to have the jury determine every material issue presented by the evidence." (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730; *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].)

■ We find no basis for holding that the failure to give instructions on voluntary and involuntary manslaughter in the context of a diminished capacity defense, and the *Ford* instruction on specific intent to commit felony murder constituted invited error on the part of the defendant's counsel. In *People* v. *Graham, supra,* 71 Cal.2d 303, 319, we held that "if defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find 'invited error'; only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause." (See *People* v. *Wilson* (1967) 66 Cal.2d 749, 762-763 [59 Cal.Rptr. 156, 427 P.2d 820].) In this case the defense counsel merely acceded to an erroneous instruction because of neglect or mistake. Defense counsel did not express a deliberate tactical purpose in suggesting, resisting, or acceding to the erroneous instruction. (*People* v. *Phillips* (1966) 64 Cal.2d 574, 581 [51 Cal.Rptr. 225, 414 P.2d 353].)

### 3. *Defendant's contention as to illegal search and seizure*

■ The police officers had received a misdemeanor complaint concerning a person matching the description of the defendant in the early morning hours of August 2, 1966. In making a superficial pat-down search for weapons one of the police officers "felt a sharp object like a knife blade." The police removed the object from the defendant's pocket and found that the object was not a knife but the wristwatch of the deceased. Defendant contends that the watch constituted the product of an illegal search and seizure and hence was inadmissible at trial.

On occasion, the police have used the excuse that an object in a person's pocket felt like a weapon to perform an exploratory search of the person's clothing and empty the citizen's pockets of everything. (Compare, e.g., *People* v. *Britton* (1968) 264 Cal.App.2d 711, 717 [70 Cal.Rptr. 586]; *People* v. *Martines* (1964) 228 Cal.App.2d 245, 247-248 [39 Cal.Rptr. 526]; with *People* v. *Armenta* (1968) 268 Cal.App.2d 248, 251 [73 Cal.Rptr. 819].) *Terry* v. *Ohio* (1968) 392 U.S. 1, 27 [20 L.Ed.2d 889, 909, 88 S.Ct. 1868], explained the rationale and limits of pat-down searches for weapons: "[T]here must be a narrowly drawn authority to

permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Sibron* v. *New York* (1968) 392 U.S. 40, 65 [20 L.Ed.2d 917, 936, 88 S.Ct. 1889, 1912], further explained: "The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault."

Hence, *Terry* and *Sibron* indicate that if an officer does not have probable cause for arrest but entertains a prudent reason to fear for his safety, he may perform a superficial pat-down search for weapons, but he may not reach inside the clothing of the suspect unless he has reason to believe a weapon is concealed there. Unless the officer feels an object which a prudent man could believe was an object usable as an instrument of assault, the officer may not remove the object from the inside of the suspect's clothing, require the suspect to take the object out of his pocket, or demand that the suspect empty his pockets. If the officer obtains contraband from the suspect's clothing, the trial court, in order to justify the search and the introduction of the fruits of the search into evidence, must find that the object could have felt like an object usable as an instrument of assault. (See *Sibron* v. *New York, supra,* 392 U.S. 40, 64-66 [20 L.Ed.2d 917, 935-936]; *People* v. *Britton, supra,* 264 Cal.App.2d 711, 717.) A box of matches, a plastic pouch, a pack of cigarettes, a wrapped sandwich, a container of pills, a wallet, coins, folded papers, and many other small items usually carried in an individual's pockets do not ordinarily feel like weapons. A more intensive or broad search "violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable instrusions on the part of all government agents." (*Sibron* v. *New York, supra,* 392 U.S. 40, 65-66 [20 L.Ed.2d 917, 936].)

In this case, however, the officer could, and did, reasonably believe that the object in the defendant's pocket was a knife. Indeed, for several years prior to *Terry* and *Sibron* we repeatedly held that "circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians . . . on the streets for questioning. If the circumstances warrant it, he may in self-protection request a suspect . . . to submit to a superficial search for concealed weapons. Should the investigations then reveal probable cause to make an arrest, the officer may arrest the suspect

and conduct a reasonable incidental search." (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658].)

### 4. *Sufficiency of the evidence*

Defendant urges that the evidence does not support the guilt verdict. He emphasizes that since no one witnessed the killing, all the evidence against him is no more than circumstantial. He contends that the police merely found him in the vicinity of the murder at approximately the time of the crime; that upon arrest his demeanor did not indicate guilty knowledge; that he admitted that he did not own the deceased's watch but had found it. Finally, he argues that the blood on his and the deceased's clothing and his skinned knuckles did not constitute conclusive evidence of guilt.

Defendant's contention basically fails because this court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].) The People may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he committed it. (*People* v. *Huizenga* (1950) 34 Cal.2d 669, 675-676 [213 P.2d 710]; *People* v. *Alcalde* (1944) 24 Cal.2d 177, 184 [148 P.2d 627].) If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Love* (1960) 53 Cal.2d 843, 850-851 [3 Cal.Rptr. 665, 350 P.2d 705].) The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].)

The evidence as recounted above points unequivocally to defendant's presence in the vicinity of the murder. The evidence of defendant's other activities on the night of the murder, his possession of the deceased's watch only a few minutes after the murder, and the multitude of other incriminating incidents and facts clearly suffice under the above principles to support the verdict of guilt.

### 5. *Right to counsel at pretrial identification and psychiatric interview*

Defendant contends that he was denied the right to counsel at lineup under *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18

L.Ed.2d 1178, 87 S.Ct. 1951]. Yet the right to counsel at lineup only applies to lineups which occurred after June 12, 1967; it does not operate retroactively. Hence, a lineup conducted in August 1966 need not follow the rules established in *Wade* and *Gilbert* as to right to counsel.

 The defendant might still contend that the lineup "conducted in his case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 301-302 [18 L.Ed.2d 1199, 1205-1206, 87 S.Ct. 1967].) The record here fails to show any substantial unfairness in the identification of the defendant by the various neighbors of the deceased in a five-man lineup when the defendant had no attorney present. The five men were of substantially equivalent race, height, and weight, although the defendant was by two inches the shortest and by five pounds the heaviest. Mrs. Darnall identified defendant immediately after his apprehension when the police officers brought defendant back to Mrs. Darnall's apartment house. This first identification of defendant without a lineup but alone might have affected Mrs. Darnall's second identification of defendant at a properly constituted lineup. In *Stovall* the police also asked a witness-victim to identify the defendant, singly, in the witness's hospital room; in the instant case, however, unlike *Stovall,* no imperative of the witness's possible death compelled the implicative procedure of showing the defendant alone.

Nevertheless, the several minutes during which Mrs. Darnall observed the defendant, the precision of her verbal description of the defendant to the police, her vantage point in the well-lighted area of her viewing of the defendant, all indicate in this pre-*Wade* case that the witness had an independent basis for identifying the defendant. (Compare *People* v. *Caruso* (1968) 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336].) Furthermore, unlike in *Caruso,* we encounter no uncertainty here as to defendant's identification or his whereabouts at the time of the crime. We advocate no post-*Wade* practice of showing suspects to witnesses singly rather than as part of a lineup, although we recognize the exceptional circumstances of the particular situation in *Stovall.* In the instant case, however, in view of the surrounding circumstances, the other indicia of guilt, and the reliability of the identification, we find no denial of due process.

 Defendant also contends that he suffered the deprivation of a constitutional right to the presence of counsel during the examination by a psychiatrist employed by the prosecution. Dr. Rapaport examined the defendant on the afternoon of August 2, 1966, the day of the murder. Dr. Rapaport testified that he first introduced himself as a psychiatrist, explained that the district attorney had requested him to interview the

defendant, warned the defendant that he could remain silent, told him he could talk to counsel retained by himself or provided to him before deciding to proceed with the examination, and that the doctor would testify as to his findings if requested. The defendant did not object; the doctor concluded that the defendant understood the warnings. In *In re Spencer* (1965) 63 Cal.2d 400, 410-411 [46 Cal.Rptr. 753, 406 P.2d 33], we required that these warnings be given defendant and that he knowingly and intelligently waive his right to the presence of counsel during the interview; otherwise, the psychiatrist might disguise himself in the cloak of professionalism and yet interrogate the defendant on behalf of the prosecution.

Dr. Rapaport testified at the guilt phase after the date of the decision of *Spencer* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) but, in the absence of a request from the defendant or his counsel, the trial court did not rule upon the voluntariness of defendant's waiver of his right to counsel upon examination by a psychiatrist. The court should have determined, outside the hearing of the jury, whether the waiver was voluntary, particularly in view of the expressed doubts as to the defendant's mental competency, the absence of a signed waiver, and defendant's apparent lack of counsel with whom to consult so soon after his arrest. (*Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205].) We expect that the trial court will follow the correct procedure on retrial.

### 6. *Instructions at the guilt and sanity phases*

██ We cannot accept defendant's assertion of error in the instructions to the jury at the conclusion of the guilt and sanity phases of the proceedings.

The trial court gave the standard instruction on felony murder (CALJIC 302-F (revised)) with the insertion of the felonies of rape, robbery, and burglary, and the omission of arson, mayhem, and an act punishable under section 288 of the Penal Code (Pen. Code, § 189). Defendant contends that the record lacked sufficient evidence to warrant the inclusion of rape. The record contained at least enough evidence for a jury to conclude that the killing occurred in an attempt to commit rape. The victim suffered injuries to her inguinal area, vulva, buttock, and abdomen. Defendant tended to visit female rather than male neighbors of the deceased in the early morning hours of August 2, 1966. ██ A showing of less than actual rape constitutes a sufficient basis for an instruction on first degree murder in the attempt to perpetrate rape, particularly upon proof of injury to the genital area. (*People* v. *Hillery, supra,* 62 Cal.2d 692, 704-705.)

 As to possession of stolen property, the trial court gave the following instruction: "The mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of burglary or robbery. It is, however, a circumstance to be considered in connection with other evidence. To warrant a finding of guilt, there must be proof of other circumstances to prove guilt.

"In this connection, you may consider the defendant's conduct, his false or contradictory statements, if any, and any other statements he may have made with reference to the property. *If a person gives a false account of how he acquired possession of stolen property, this is a circumstance that tends to show guilt.*" (See generally, CALJIC 203 (1965 revision).) (Italics added.)

Defendant contends that the italicized sentence constituted a judicial comment to the effect that he gave a false statement when he told the officers that he had found the victim's watch. The court merely instructed that *if* the jury found the statement was false, this was a circumstance that tended to show guilt. The instruction did not constitute judicial comment on truth or falsity of the evidence. (Cf. *People* v. *O'Donnell* (1938) 11 Cal.2d 666, 671 [81 P.2d 939].)

 Defendant further urges that the trial court erroneously refused to give his proposed instruction: "You are hereby instructed that the defendant has not been convicted of the offense about which Miss Cassandra Ouellet has testified and is still awaiting trial on this matter in San Francisco." Defendant argues that failure to give this instruction misled the jury into believing that he had been convicted of the crime of rape. He contends, moreover, that the trial court erred in permitting Miss Ouellet to testify as to the earlier incident involving rape.

The court admitted Miss Ouellet's testimony for the narrow purpose of showing defendant's common plan, scheme, and design (*People* v. *Sam* (1969) 71 Cal.2d 194, 204 [77 Cal.Rptr. 804, 454 P.2d 700]; *People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Peete* (1946) 28 Cal.2d 306, 316 [169 P.2d 924]); the court properly admonished the jury as to its limited function; we find no error. The proffered instruction apparently sought to negate any impression that defendant had been convicted of any offense involving Miss Ouellet. The prosecution, however, had not referred to any such criminal proceeding; defense counsel, during the cross-examination of Miss Ouellet, alluded to the testimony of the witness at the preliminary hearing. Defendant could have further elicited on such cross-examination that he had not been

convicted of any charge of rape involving the witness. Under the circumstances, and in light of the limiting instruction as to the testimony, the trial court was not compelled to give the requested instruction.

### 7. Adequate notice of charges against defendant

██ Defendant's contentions that the indictment failed to inform him of the charges against him lack merit. (*People* v. *Jordan* (1955) 45 Cal.2d 697, 709 [290 P.2d 484].) The Grand Jury of Alameda County charged defendant with "a felony, to wit: a violation of Section 187 of the Penal Code of California, Murder, in that on or about the 2nd day of August, 1966, in the County of Alameda, State of California, he murdered Edith Christie, a human being." Together with the transcript of the grand jury proceedings which included most of the prosecution's major witnesses, defendant had constitutionally sufficient notice of the charges against him. (See *People* v. *Marshall* (1957) 48 Cal.2d 394, 399, fns. 4, 5 [309 P.2d 456].)

### 8. Rebuttal testimony

██ Defendant contends that the prosecution indulged in the proscribed practice of withholding matter properly belonging in the case in chief and introducing the evidence at rebuttal in order to get "the last word." Particularly, defendant characterizes as a violation of the rule Dr. Rapaport's testimony on rebuttal concerning the defense of diminished capacity.

We have long criticized the prosecution's use of a crucial witness on rebuttal when the witness was available and known to the prosecution during the prosecution's case in chief. (E.g., *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665]; *People* v. *Byrd* (1954) 42 Cal.2d 200, 211-212 [266 P.2d 505]; *People* v. *Avery* (1950) 35 Cal.2d 487, 491 [218 P.2d 527].) In view of Dr. Rapaport's interview with defendant on the day of the offense and his early involvement with the prosecution of the case, the prosecution could not have been surprised by the diminished capacity defense presented during defendant's case in chief. Under such circumstances the prosecution cannot persuasively contend that it should not have introduced the doctor's testimony as part of its own case. (Cf. *People* v. *Wein* (1958) 50 Cal.2d 383, 406-407 [326 P.2d 457].)

The order of proof, however, lies within the sound discretion of the trial court under Penal Code section 1094. In this case the defense raised no objection to the rebuttal testimony of Dr. Rapaport. In the absence of an objection to the trial court, we certainly cannot hold that it abused its discretion in permitting Dr. Rapaport to testify on rebuttal. (*People* v.

*Wein, supra,* 50 Cal.2d 383, 407; *People* v. *Carter, supra,* 48 Cal.2d 737, 754.)

Because defendant's conviction for murder must be reversed for errors discussed above, we need not reach his further contentions of error; such errors will probably not arise on retrial.

The conviction of murder of the first degree entered against defendant is reversed. The case is remanded to the Alameda County Superior Court for further proceedings consistent with this opinion.

Traynor, C. J., Peters, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment entered after jury verdicts finding defendant guilty of first degree murder, finding him sane, and fixing the penalty at death.

In discussing the sufficiency of the evidence, the majority state that "The evidence of defendant's other activities on the night of the murder, his possession of the deceased's watch only a few minutes after the murder, and the multitude of other incriminating incidents and facts clearly suffice . . . to support the verdict of guilt." Later, the opinion states that in view of the evidence that the victim suffered injuries to her inguinal area, vulva, buttock and abdomen, plus the evidence of defendant's attempts to gain entry into the apartments of at least four other women about the time of the attack on the deceased, "The record contained at least enough evidence for a jury to conclude that the killing occurred in an attempt to commit rape." Thus, there was substantial evidence to support the conviction of first degree murder under the felony-murder rule. The conviction is nevertheless reversed because "the court did not properly instruct the jury as to the 'elements' of voluntary manslaughter in a case in which the defendant asserted the defense of diminished capacity."

Being compelled to abandon the phrase "non-statutory manslaughter" as a new crime (see fn. 1, majority opinion) the court now adds a new "element" to statutory manslaughter. The recognition that factors other than sudden quarrel or heat of passion may render a person incapable of harboring malice does not, in my opinion, add another element to the offense of manslaughter. By statutory definition, manslaughter is the unlawful killing of a human being without malice; the absence of malice disproves one of the elements of murder.

The instruction on diminished capacity to negate malice charged the jury to consider what effect, if any, it had on defendant's ability to form any of the specific mental states that are essential elements of murder, and it charged them that if defendant's mental capacity was so diminished that he

did not harbor malice they could not find him guilty of murder. One of the mental states for murder is malice, and the malice that is implied in the felony-murder doctrine from the commission of a felony inherently dangerous to human life includes the specific intent to commit that felony. It follows, therefore, that if the jury had a reasonable doubt that defendant's diminished capacity prevented him from harboring malice, it also prevented him from having the capacity to formulate the intent to commit the underlying felony.

Following the instruction on diminished capacity, the jury were instructed that if the evidence was insufficient to find, or if they had a reasonable doubt, that the killing was murder, the defendant might be found guilty of the lesser included offense of manslaughter; and if they were satisfied that the killing was unlawful but had a reasonable doubt whether the killing was murder or manslaughter they must give defendant the benefit of the doubt and find it to be manslaughter rather than murder.

Without mentioning that the above instructions were given, the majority seize upon the court's definition of voluntary manslaughter as "the intentional and unlawful killing of a human being without malice aforethought upon a sudden quarrel or heat of passion, without deliberation or premeditation" as operating to "exclude" from the jury's consideration other factors that might show the absence of malice. The jury were instructed "not to single out any certain sentence or any individual point or instruction and ignore the others, but . . . to consider all the instructions as a whole, and . . . to regard each in the light of all the others." Assuming that the jury followed this admonition, the instructions given, considered as a whole, sufficiently informed them that if malice were rebutted by evidence of diminished capacity they could not find defendant guilty of an offense higher than manslaughter.

The majority further speculate that the jury might well have understood the instruction on diminished capacity to apply only to deliberate and premeditated first degree murder and not to the specific intents to commit rape, robbery or burglary. The facts of this case, the manner of presentation by the prosecution, and the questions asked of both psychiatrists make it improbable that the jury misunderstood the instruction. The theory of the prosecution was first degree felony murder. Referring to first degree murder as defined in section 189 of the Penal Code, the prosecutor in his argument said "the relevant part of this section as it applies to this case" is that all murder committed in the perpetration or attempt to perpetrate any of the six enumerated felonies is murder of the first degree. The defense psychiatrist, Dr. Miller, was asked on cross-examination, "Now let's get back to the original question, Doctor, about the specific intent, the ability to formulate the specific intent to commit a robbery," and "My question is, did Mr. Mosher have the capacity to formulate the intent to rape? . . . Now

how about on August 2d [date of attack on the deceased]? Would he have had the ability to formulate the intent to rape?" The psychiatrist who testified for the prosecution was asked: "In your examination of Mr. Mosher, did you arrive at an opinion as to his ability to formulate the intent to rob as of the morning of August 2, 1966?" Neither psychiatrist was asked whether in his opinion defendant had the ability to premeditate or deliberate.

I disagree that defendant adduced sufficient "facts" from which the jury might have found that his capacity was so diminished that he could not harbor the intent to commit rape, robbery or burglary. The majority state as facts that defendant ate dinner at his apartment about 9 p.m., walked to a bar about 11:30, consumed five or six drinks of whiskey, and when subsequently interrogated he could not remember any of the night's events except that he started walking home after the bar closed and while on the street police officers questioned him. The testimony relating to the time defendant ate dinner, the number of drinks he consumed, and his poor memory for the night's events was given at the second part of the trial, on defendant's additional plea of not guilty by reason of insanity (see Pen. Code, §§ 1026-1027) by one of the court-appointed psychiatrists who examined defendant and investigated his sanity.

At the guilt phase defendant did not testify, and the only witnesses for the defense were Mr. and Mrs. Tiner, defendant's supervisor and his wife, and Dr. Miller, the psychiatrist employed by defendant. Dr. Miller did not examine defendant until six months after the crime. He based his opinion on defendant's diminished capacity on an interview with defendant and his parents at that time, his review of medical reports of others, a reading of the grand jury transcript, and a conversation with the Tiners a few minutes before he took the stand. He testified that defendant told him he could account for all of his time between leaving a bar around closing time and being questioned by police officers on the street, a period of some 30 to 45 minutes. Because the time lapse did not correspond with the record of the time of defendant's apprehension, Dr. Miller testified that this "suggested" to him the possibility of some type of amnesia. In his opinion, defendant did not have the capacity to formulate the intent to rape, or to rob, or to commit any crime. The psychiatrist who testified for the prosecution examined defendant the day of the crime, and in his opinion defendant was mentally competent to formulate the specific intent to commit a robbery, he was not mentally ill, and had "no psychiatric condition which would have prevented him from knowing what he was doing" at the time of the offense. The conflicting opinion testimony on the issue of defendant's diminished capacity was resolved in favor of the prosecution.

In my opinion, defendant was not deprived of his constitutional right to

have the jury determine every material issue presented by the evidence, and a review of the entire record precludes the conclusion that there has been a miscarriage of justice. (Cal. Const., art. VI, § 13.)

Mosk, J., concurred.